No. 27,877.

CAROLYN E. McCULLOUGH, *Appellee*, v. THE LIBERTY LIFE
INSURANCE COMPANY, *Appellant*.

(264 Pac. 65.)

**SYLLABUS BY THE COURT.**

1. ACCIDENT INSURANCE — *Accidents Insured Against — Intentional Injury by Third Person.* Ordinarily where one person intentionally injures another without misconduct on the part of the latter, and unforeseen by him, such injury as to the latter is accidental.

2. SAME — *Accidents Insured Against — Intentional Killing by Third Person.* And where an accident insurance policy provided for payment in the event the insured should sustain bodily injury directly and independently of any other cause, through external, violent and purely accidental means, the killing of the assured by a third person, though intentional, is deemed accidental within the meaning of the policy if the killing was not brought about by the agency of the assured.

3. SAME—*Accidents Insured Against—Special Interrogatories.* In an action by the beneficiary of an accident insurance policy to recover for the death of her husband, the proceedings considered and held not error to refuse to submit special questions requested by the defendant.

4. SAME—*Accidents Insured Against — Instructions.* And further, the instructions considered and held not to have been improper.

Appeal from Woodson district court; FRANK R. FORREST, judge. Opinion filed February 11, 1928. Affirmed.

*Stephen H. Allen, Otis S. Allen, George S. Allen,* all of Topeka, and *Solon T. Gilmore,* of Kansas City, Mo., for the appellant.

*G. H. Lamb* and *W. E. Hogueland,* both of Yates Center, for the appellee.

The opinion of the court was delivered by

HOPKINS, J.: The action was one by the wife of Thurlow W. McCullough to recover on an accident insurance policy for his death, he having been killed by a bandit who robbed the Santa Fe railway station at Iola where McCullough was night operator and ticket agent. Plaintiff prevailed and defendant appeals.

The facts, related chiefly by the baggageman, Frank Marks, the only eye-witness of the tragedy, were substantially as follows: A train had arrived and departed about five o'clock on the morning of March 22, 1926. Marks had delivered the mail to the mail carrier and had gone into the baggage room to sleep or rest until the

---

Accident Insurance, 1 C. J. pp. 431 n. 8, 513 n. 61. Insurance, 30 L. R. A. 207; 48 L. R. A. n. s. 524; 20 A. L. R. 1123; 14 R. C. L. 1260. Trial, 38 Cyc. p. 1910 n. 23.

coming of another train which was due at 6:30. The depot is east of the main track. He lay down on a truck, and after ten or fifteen minutes heard a noise or voices, he thought, on the east side of the depot or in the waiting room next to the baggage room. He got up, went out and found a man outside the waiting room a little distance from the west door. The man threw a flash light on him and then a gun and commanded him to go to the bay window of the ticket office, which is on that side of the depot, and open or break the window and get the money from the money drawer.

"Well, I walked up to about the center of the window and somebody shot a shot through that window right over my head. . . . I made a dive for the baggage room and when I got just about to the baggage room, he caught up with me. . . . He commenced punching me with the gun again and told me to go back there and break that window and get the money. . . ."

"He says: 'if you don't bring me the money, I am going to kill you.' It then struck my mind that if he was going to stay outside for me to bring him the money that would be the last he would see of me. Then when I opened the door and went into the waiting room, and when I just got a step or two inside I heard another shot. I don't know who fired that shot and I don't know from where it was fired. I made another step or two and this bandit then shot twice. He was leaning right through the door and shot twice toward the trainmen's window."

The trainmen's window was in the ticket office where McCullough was then located. Marks, according to his story, then made his escape and ran to a near-by house (Ralston's, the day ticket agent's residence). He heard another shot as he was running away and still another after arriving at the house. The officers were summoned and several men within a few minutes returned to the railway station. McCullough was found lying on his back in the ticket office, the telephone in one hand, the receiver in the other, one bullet through his temple and another through his heart. The latter wound apparently had been inflicted when he was lying on the floor, as the bullet was found on or in the floor directly under his back where it had gone through his body.

The question for consideration is whether, according to the terms of the insurance policy, the death of the insured occurred by accidental means. A pertinent part of the policy reads:

"Part 1. In the event the insured while this policy is in force shall sustain personal bodily injury, which is effected directly and independently of any other cause, through external, violent and purely accidental means, and which shall leave some visible mark and which injury causes . . .

"Part 2. For any one of the following specific total losses described in this paragraph which shall result solely from injury as described in Part 1, within

ninety days from the date of the accident, the company will pay in lieu of any other indemnity; life . . . The principal sum."

The petition alleged that the insured "was without fault on his part, was by violent and purely accidental means killed by bandits and persons unknown to this plaintiff in an attempt to and a consummated robbery of the Santa Fe depot at Iola, March 22, 1926."

The defense was that at the time of the killing, the insured "made an attack upon the bandit who was attempting to rob the office of the company by firing at him with a gun or pistol, and in making such attack the insured assumed the risk of death, and his death was the direct result of such attack."

No evidence was introduced to support the allegations of the defendant's answer. The only statements which at best might show by inference that the insured attacked the robber or offered resistance were made by the witness Marks to the effect that sometime before the tragedy he talked to the insured about a holdup, and insured had said that he would defend the place; that he would shoot them enough to hurt them; that they would know it when he got through with them although he would not kill them, and "that somebody shot through the window, right over his (Marks) head," and that he (Marks) said to the robber he didn't want to be killed by his best friend. This can hardly be said to have been evidence showing an attack by the insured. When he was last seen alive by the witness Marks, McCullough was crouching behind the safe in the ticket office. No gun or pistol was observed to be in his hand. When he was next seen, he was lying on the floor of the ticket office with the telephone and receiver in his hands. There was no gun, pistol or weapon of any kind on or about his body or in the room. Marks also testified:

"I didn't see McCullough do any shooting there that night or have a revolver or gun of any kind in his hands. The only time I saw McCullough during the trouble was when he was crouching down behind the safe."

The plaintiff's theory was that there were two bandits; that the one unseen by Marks was on the other side of the ticket office. On its part the defendant insistently argues that McCullough was the only person in the ticket office; that the shots came through the window in the ticket office and that two empty shells were found on the floor of the ticket office by the sheriff. The evidence, in our opinion, does not justify the conclusion of the defendant. Marks' testimony was that there was a shot (the first) through the window

over his head. The known bandit behind him could very well have shot over Marks' head into the ticket office at McCullough; and so far as finding the shells was concerned, L. E. Brown testified that he went to the station and found McCullough dead in the ticket office; that he didn't see any gun in the ticket office.

"I believe some of them found a couple of shells, but that's just hearsay with me. I didn't find any shells on the floor. I don't know where the two shells were picked up. I saw them in the sheriff's possession. I and Mr. Creason were the first ones to arrive there."

If there was evidence of shells being found in the ticket office and the defendant deemed it material, that fact should have been shown. In any event, we do not deem the question of sufficient importance to reverse the case for the purpose of ascertaining the fact as to whether or not the insured offered resistance. The fact is clear that with the telephone in one hand and the receiver in the other, he could not have been offering much resistance at the time of the fatal shots.

The defendant complains of the refusal of the court to submit special questions as follows:

"1. What was the bandit's purpose of killing McCullough?

"3. Who fired the first shot?

"6. Who fired the second shot?

"8. Could McCullough have avoided injury by delivering the money to the bandit?"

Other than as stated there was no evidence introduced pertinent to the first question. The only rational inference from the evidence adduced was that the bandit's purpose was robbery. Any other answer would have been based on mere conjecture. If the question had been submitted and the jury had answered "robbery," how could the answer have aided the defendant's case? The second and third questions were companions. An answer thereto would have been little more than a guess. The evidence did not justify an answer that McCullough fired the shots. Therefore the jury, in our opinion, could have made but one answer, "We do not know." There was no evidence on which an answer to the fourth question could have been predicated, no evidence of a demand on McCullough to deliver the money or to do any other act. Under all the circumstances, it made no difference since the bandit killed McCullough. Therefore, the defendant was not prejudiced by refusal of the court to submit the question.

Complaint is made of the instructions and especially of the ninth, which reads:

"You are further instructed that the court defines the words 'purely acci-
dental means' to be that the insured had no part in it and did not contribute
anything toward inflicting the injury; and the court further defines the words
'purely accidental means' not broad enough to permit the defendant company
to put the construction upon said words that the bandit intentionally inflicted
the injury. It is conceded that the bandit intentionally inflicted the injury
upon the insured which resulted in the death of the insured, and so far as his
death is concerned, you are instructed that it was by 'purely accidental means.'"

The instructions taken as a whole, were not, in our opinion, im-
proper. The words "accident" and "accidental means" as used in
insurance policies, have been the subject of many definitions by
the courts. Many policies have provisions exempting companies
from liability in case the insured is injured "by his own act or the
act of another." Some of the cases cited by the defendant were
where the company did not insure against the "act of another."

Numerous other cases are cited supporting its theory, too many to
here analyze. They were no doubt selected from almost a wilder-
ness of cases in which varying facts and situations have been applied
to varying principles. We think the better rule is that if one person
intentionally injures another without misconduct on the part of the
latter and unforeseen by him, such injury as to the latter is acci-
dental.

In *Gilliland v. Cement Co.,* 104 Kan. 771, 773, 180 Pac. 793, it
was said:

"The word accident does not have a settled, legal signification. It does have,
however, a generally accepted meaning which is the same whether considered
according to the popular understanding or the approved usage of language.
An accident is simply an undesigned, sudden, and unexpected event, usually of
an afflictive or unfortunate character, and often accompanied by a manifesta-
tion of force. The word undesigned must not be taken too literally in this
connection, because a person may suffer injury accidental to him under cir-
cumstances which include the design of another."

In *Stark v. Wilson,* 114 Kan. 459, 219 Pac. 507, this court con-
sidered the question whether the stabbing of a street-car conductor
by a passenger without cause on the part of the conductor was an
accident within the meaning of the workmen's compensation act. It
was said:

"In this instance, the conductor was without fault, and so the assault must
have been the result of innate malevolence, provoked by the fact, not that he
was Orville Stark, but that he was conductor of the car. Therefore, the court
holds the workman lost his life through personal injury by accident arising
out of his employment, within the meaning of the workmen's compensation
act." (p. 463.)

Volume 5 of Joyce on The Law of Insurance (4956, 4957, § 2863a), contains an instructive chapter on accident, as applied to cases of insurance, wherein quotations are taken from various courts. Accidents are described as of two kinds: First, those that befall a person without any human agency, as for instance, a person being killed by lightning, etc.; second, those that are the result of human agency. This class he divides into four subdivisions:

"  . . . Fourth: if one person intentionally injures another, which does not result from an encounter or misconduct of the latter, but was unforeseen by him, such injury as to the latter, although intentionally inflicted by the former, would be accidental. When the injury is not the result of the misconduct or the participation of the injured party, it is to him, accidental, although inflicted intentionally by the other party." (Citing *Hutchcraft's Executors v. The Travelers Insurance Co.*, 87 Ky. 300, 302.)

Other accidents of this class have been defined, in substance, as: An injury brought about designedly by another and occurring without the assured's agency. (*Maloney v. Maryland Casualty Co.*, 113 Ark. 174, 167 S. W. 845.) Death caused by fall or blow struck by a third person under a policy against injuries or death caused through external, violent and accidental means. (*Richards v. Travelers Ins. Co.*, 89 Cal. 170, 23 A. S. R. 455.) Being waylaid and killed by robbers where the insured, a bank cashier, was shot and killed by a person attempting to rob the bank, and it is immaterial that as to the insured the injury was unexpected and unforeseen. (*Travelers Protective Ass'n v. Fawcett*, 56 Ind. App. 111.)

The same author, Joyce, holds that death by assassination and murder are both accidental, and that the killing by a third person of an insured person without the latter's connivance or foreknowledge, is held to be accidental. (Citing *American Accident Company v. Carson*, 99 Ky. 441, 34 L. R. A. 301. See, also, *Supreme Council of the Order of Chosen Friends v. Garrigus*, 104 Ind. 133, 54 Am. Rep. 298; *Ripley v. Railway Passengers' Assur. Co.*, 20 Fed. Cas. 823; *Mabee v. Continental Casualty Co.*, 37 Ida. 667, 37 A. L. R. 348; *Railway Officials & Employees Accident Ass'n v. Drummond*, 56 Neb. 235, 241, 76 N. W. 562; *Insurance Company v. Bennett*, 90 Tenn. 256, 25 A. S. R. 685; *Button v. American Mutual Accident Ass'n*, 92 Wis. 83; 53 A. S. R. 900; 14 R. C. L. 1260, § 437; 1 C. J. 431.)

The judgment is affirmed.