104 So.2d 171

Mrs. Katie GASKINS, Widow of Clarence E. SCHONBERG, Mrs. Frances Ruth Schonberg, Wife of William J. Stewart, and Irvin H. Schonberg

v.

**NEW YORK LIFE INSURANCE COMPANY.**

No. 42183.

June 27, 1958.

Azzo J. Plough, Moreau J. Jumonville, New Orleans, for plaintiffs-appellants.

Phelps, Dunbar, Marks, Claverie & Sims, Ashton Phelps, J. Walter Ward, New Orleans, for defendant-appellee.

TATE, Justice ad hoc.

Plaintiffs are the widow and children of Clarence E. Schonberg, to whom prior to his death defendant had issued two life insurance contracts. Plaintiffs, as beneficiaries under the policies, appeal from dismissal of their suit to recover double indemnity benefits thereunder in the total amount of $5,000 (defendant insurer having voluntarily paid the principal benefits).

The applicable policy provision pertinently states:

"The Double Indemnity provided on the first page hereof shall be payable upon receipt of due proof that the death of the Insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means and occurred within ninety days after such injury.

"Double Indemnity shall not be payable if the Insured's death resulted * * *, directly or indirectly, from infirmity of mind or body, from illness or diseases, * * *".

Plaintiffs contend that the decedent's death during surgery resulted from "anaphylactic shock" produced by a very rare blood transfusion reaction. The principal legal issue of this appeal is, if so, whether such death resulted through "accidental means" within the intention of the policy, so as to entitle his beneficiaries to recover double indemnity benefits under the above-quoted clauses.

It may be well, before discussing the facts herein, to note that the coverage afforded for loss resulting from bodily injury effected through "external, violent and accidental means" has been construed by numerous cases, and that the authorities are in general agreement as to the coverage so afforded by provisions similar to those above quoted and involved herein, except as to what is meant by "accidental means." See 1 Appleman, Insurance Law & Practice, Section 393, p. 473 et seq.; 6 Cooley, Briefs on Insurance, 2d Ed., pp. 5233–5255; see, also, 5 Couch, Cyclopedia of Insurance Law, Section 1137, p. 3963 et seq., Section 1142, p. 4004 et seq.; see, also, 45 C.J.S. Insurance § 753, on page 777, § 754, p. 783, § 938c, p. 1076, § 938d, p. 1082; see, also, 29 Am.Jur., Sections 930 through 934, cf. e.g., Sections 995 through 1009.

These cited treatises reflect general agreement that all three tests must be

met before coverage is afforded; that is, the loss must be produced by "external", by "violent", and by "accidental" means. Such means must be the proximate cause of the resulting death, but a total absence of latent contributing causes is not required for coverage to be afforded. In construing "external means", it is only necessary that the cause of death or injury be external to the person, though it acts internally. "Violent" refers to some act not occurring in the ordinary run of things and may be fulfilled by any force whatsoever, however slight. But while the authorities concur that "the words 'accident' and 'accidental' mean that which happens by chance or fortuitously, without intention or design, and which is unexpected, unusual and unforeseen", 29 Am.Jur. "Insurance" Section 931, p. 707, there is a sharp divergence (which will be discussed below at greater length) in the various jurisdictions as to whether or not the requirement that the loss result from accidental "means" necessitates that there be an unintentioned act as *cause* in addition to the unintended *result* of bodily injury eventuating in death.

With regard to the present case, although defendant successfully contended in the trial court that the death of defendant, a 67 year old man, resulted primarily from his bodily infirmities, the uncontradicted testimony of the six medical witnesses testifying (including the attending surgeon, the attending anesthetist, and the pathologist who completed an autopsy upon the decedent immediately following his death on February 19, 1948) shows that the cause of the decedent's death was anaphylactic shock due to a transfusion reaction. The medical testimony further shows that anaphylactic shock is an extremely rare reaction occurring because of some prior unpredictable sensitization of the patient to some component of the blood used in the transfusion.[1] The medical experts uniformly agreed that such a reaction is unexpected, unusual and unforeseen;[2] and unquestionably, under the evidence, the anaphylactic shock suffered by decedent which resulted in his death was an "accident" or "accidental", within the general legal meaning assigned to such terms. (C.f., 29 Am. Jur. "Insurance" Section 931, p. 707: "The

1. Dr. Julius W. Davenport, Jr., Director of the Department of Intravenous and Blood Transfusion Service at Southern Baptist Hospital, defined anaphylactic shock as follows, which is in accordance with the definition as stated by the other medical experts: "Anaphylactic shock is a pathologic or abnormal condition brought about in either man or laboratory animals by sensitization to some foreign protein or other chemical substances, specifically a chemical substance

or protein from a member of another species, and in different types of laboratory animals it produces somewhat different results. In humans it commonly produces a fast drop in the blood pressure leading to a condition of shock which, if prolonged enough, will bring about death. * * * "

2. For instance, Dr. Philip H. Jones, a specialist in internal medicine, testified:
"Q. From your study of this record, Doctor, what is your opinion as to the

definition that has usually been adopted by the courts is that an accident is an event that takes place without one's foresight or expectation—an event that proceeds from an unknown cause, or is an unusual effect of a known cause, and therefore not expected.")

Further, the medical testimony shows, without serious contradiction, that neither a latent heart condition to which decedent was subject, the prostatic condition for which the operation was being performed, the minor drop in blood pressure associated with operative shock, nor various other medical symptoms exhibited by decedent, caused or contributed to his death. Thus any bodily infirmity or disease to which the decedent was subject, not being a predominant cause of his death, does not defeat recovery by his beneficiaries herein. Lips-

comb v. Equitable Life Assur. Soc., 205 La. 738, 18 So.2d 167; De Blieux v. Travelers Ins. Co., 185 La. 620, 630, 170 So. 14; see, also, Franklin v. Mutual Life Ins. Co., 216 La. 1062, 45 So.2d 624; Frerichs v. London & Lancashire Indem. Co., 169 La. 182, 124 So. 821.

But able counsel for defendant-appellee—conceding that if decedent's death resulted from anaphylactic shock, all other policy conditions were met—contends that recovery may not be allowed herein since, although the anaphylactic shock was the accidental *result* of the blood transfusion, the said blood transfusion itself (the "means" by which such bodily injury was effected) was an intentional act, and, therefore, could not be an *accidental* means so as to meet the requirement of double indemnity coverage.

cause of this man's death? A. He died from anaphylactic shock.

"Q. Was that anaphylactic shock the result of the blood transfusion? A. Yes. I had better correct that. It was the result of certain substance going in with the blood transfusion which was not expected to be there and which brought on the shock.

\* \* \* \* \*

"Q. Now, Doctor, this anaphylactic shock which in your opinion was the cause of death here, was that something that could reasonably have been foreseen—could reasonably have been expected to occur—or is that something that is extraordinary and completely unforeseen and completely unpreventable and unanticipated? A. I think it is unexpected, unforeseen, and, unless one had prophetic vision, could not have been prevented. It is a common thing for patients having

transfusions to have some events take place such as pile itching and so forth. Those things are trivial, they are reasonably controlled. They are due often to some normal food elements being in the blood that is being administered. This sort of transfusion reaction is not particularly dangerous or feared. Anaphylactic shock, which is very rare and entirely unexpected, is an allergic reaction, but it is a difference between the degree such as to make almost a difference in kind. If I might illustrate: You light a fire cracker and you get an explosion—perhaps burn your finger. If you lit a fire-cracker and it blew your arm and shoulder off that would be an analogous situation and it would be something beyond what would be expected in ordinary black powder to make such an explosion. This is the sort of explosion that occurred in this patient."

Counsel cites and relies upon Parker v. Provident Life & Accident Ins. Co., 178 La. 977, 152 So. 583, 586, wherein construing an identical clause in a disability policy we stated:

"The overwhelming weight of authority is to the effect that, if the means which produces an injury is intentionally, voluntarily used in the usual and expected way, the resulting · injury, though unexpected, unusual, or unanticipated, is not produced by 'accidental means.' But if in the act which *precedes* the injury there intervenes something unforeseen or unexpected, or if something unusual occurs which produces the injury, then it may be said that the injury resulted through 'accidental means.' "

In the Parker case, a workman pulling on a jackscrew sustained a hernia. We held (over the dissent of our late Chief Justice O'Niell and one other member) that he was not entitled to disability benefits predicated upon bodily injury sustained through "accidental means" because he *intended* to pull on the jackscrew, and thus the hernia as the unexpected or accidental result of an intended act was not produced by accidental *means*.

As the dissent points out, although specifically approving of our earlier decision in Brown v. Continental Cas. Co., 161 La. 229, 108 So. 464, 45 A.L.R. 1521, the hold-ing in the Parker case was actually in conflict therewith.

In the Brown case the beneficiary of a policy providing for indemnity for loss of life by accidental means, was allowed recovery for the decedent's death by an unintentional overdose of chloroform and/or chloral. The decedent was a physician who used such substances to relieve headache and insomnia. He died, either from an overdose of chloral, or (the evidence was uncertain) because he fell asleep while inhaling chloroform and thus inhaled too great an amount.

The Parker opinion, on rehearing, attempted to reconcile its holding with the Brown case by stating that the decedent in the latter case intended to inhale only the usual quantity of chloroform and unintentionally inhaled too much (i. e., enough to cause his death rather than merely to induce sleep and relieve his headache).

As Chief Justice O'Niell pointed out in his dissent, under such an application of the verbal test used in the Parker case, recovery should likewise have been allowed therein because the workman in the Parker case did not intend to turn the jackscrew with so much force·as to herniate himself.

Likewise, in the present case under such an application of the supposed distinction between an accidental *means* and an accidental *result* as set forth in the Parker case, recovery herein could be allowed upon the theory that although the blood trans-

fusion was an intended act, it was not intended to transmit into the decedent's blood the reagent which produced such a violent and indeed fatal reaction.

Without discussion, but apparently upon such reasoning, in Lipscomb v. Equitable Life Assur. Soc. of United States, 205 La. 738, 18 So.2d 167, recovery was allowed upon a similar double indemnity clause for death resulting from food poisoning. (For, under the literal test the decedent intended to eat the food, so that the act or cause or "means" could be said to have been intentional and nonaccidental even though the result—the food poisoning—was accidental.)

Our brethren of the Orleans Court of Appeal, in Brackman v. National Life & Accident Insurance Co. of Tennessee, 5 So. 2d 565, certiorari denied, likewise allowed recovery under double indemnity provisions when decedent died through sunstroke, although the United States Supreme Court in Landress v. Phoenix Mutual Life Insurance Company, 291 U.S. 491, 54 S.Ct. 461, 78 L.Ed. 934, 90 A.L.R. 1382, had under identical circumstances denied the claim; commenting, 5 So.2d 570:

"We cheerfully, though rather confusedly, accept the doctrine of the Landress case and the Parker case, that there is a distinction between accidental means and an accidental result, * * * there is respectable authority for the view, that even the distinction recognized in the Landress and the Parker cases is a spurious one * * *."

Both the Louisiana Supreme Court's Parker case and the United States Supreme Court's Landress case were decided in 1934 over the dissent of distinguished members of both courts. Both cases applied the test as to accidental means which was then followed by the majority of American jurisdictions. However, the test enunciated has in practice proved to be confusing and capable of such technical refinement as to be almost meaningless. See, Annotation Insurance—Accidental Means, 166 A.L.R. 469.[3] Cf. e. g. Annotations, 52 A.L.R.2d 1083, 35 A.L.R.2d 1105; also, the treatise references set forth supra.

We think worthy of reiteration herein the criticism of the distinguished dissenting justices in the Landress and Parker

3. Cf., comment of the editor, 166 A.L.R. 477 (footnotes omitted):
"This whole branch of insurance law has become shrouded in a semantic and polemical maze, and the result has been 'almost a wilderness of cases in which varying facts and situations have been applied to varying principles.' The situation is fast approaching a point where

the slight flame of legal theory involved is being smothered. Some of the courts have felt it necessary to resort to tortuous and tortured legal jiu-jitsu to distinguish and differentiate between 'accidental means' and 'accident,' 'accidental result,' 'accidental death,' 'accidental injury,' etc. Accordingly, the courts of last resort in several jurisdictions have ac-

cases, supra cit., of the alleged distinction therein between an "accidental result" and an "accidental means" for purposes of determining policy coverage under the language of the insuring clause here in question.

Our late Chief Justice O'Niell in his dissenting opinion in the Parker case stated, 178 La. 977, 152 So. 589:

"There is really no justice in this supposed distinction, which the members of the Association of Life Insurance Counsel are striving to impress upon the courts, between 'accidental injury' and 'injury by accidental means.' * * * I believe that a vast majority of prospective policyholders, and of all men of ordinary or above ordinary intelligence, outside of the Association of Life Insurance Counsel, would be led to join in the wonder of John Byrom:

"'Strange all this difference should be Twixt Tweedledum and Tweedledee.'"

Mr. Justice Cardozo, in his dissent from the attempted distinction recognized by the majority in the Landress case, had this to state, 291 U.S. 499–501, 54 S.Ct. 463–464 (citations omitted):

"The attempted distinction between accidental results and accidental means

will plunge this branch of the law into a Serbonian Bog. 'Probably it is true to say that in the strictest sense and dealing with the region of physical nature there is no such thing as an accident.' * *. * On the other hand, the average man is convinced that there is, and so certainly is the man who takes out a policy of accident insurance. It is his reading of the policy that is to be accepted as our guide, with the help of the established rule that ambiguities and uncertainties are to be resolved against the company. * * * When a man has died in such a way that his death is spoken of as an accident, he has died because of an accident, and hence by accidental means. * * * If there was no accident in the means, there was none in the result, for the two * * * were inseparable. * * * There was an accident throughout, or there was no accident at all."

Because of such doubts as to the validity of a distinction between injury by accidental means and injury as an accidental result, as the above-cited treatises and annotations recognize, there is a growing minority of jurisdictions which prefer to construe a death resulting from bodily injury effected by accidental means as, simply, what in the ordinary language of

cepted and approved Mr. Justice Cardozo's views [in his dissent in the Landress case] as expressed above as a

common-sense approach to the legal theory involved."

laymen is considered to be an accidental death.[4] "In an increasing number of jurisdictions, the distinction between the term 'accidental means' and the terms 'accident,' 'accidental result,' 'accidental injury,' 'accidental death,' and the like, has been rejected or repudiated, and the terms are regarded as legally synonymous." 166 A.L.R. 473.

The rationale of the decisions in the jurisdictions rejecting or abandoning such a technical distinction is summarized in the Annotation 166 A.L.R. 469, at page 474. Basically, these decisions rely upon the principle that the terms used in an insurance policy should be construed in their ordinary and popular sense, and that any ambiguity therein should be construed in favor of the insured and against the insurer. As did the dissents above quoted, these decisions point out that death by accidental means and death as an accidental result are logically indistinguishable; that "if there is any question about the existence of an accident in either, there is the same question in the other; if there is an accidental result, there necessarily must have been an accidental means—the two cannot logically be separated, for either there is no accident at all or there is an accident throughout," 166 A.L.R. 474.

■ The rationale of these decisions is in accordance with Louisiana jurisprudence regarding the interpretation of virtually all insuring clauses and insurance contracts other than the technical construction of the present clause upheld by the Parker case. For instance, in Seguin v. Continental Service Life & Health Ins. Co., 230 La. 533, 89 So.2d 113, 55 A.L.R.2d 1014, we held that the language in a health and accident policy should be construed in its plain, ordinary, and popular sense, rather than according to a technical meaning, especially since the companies contract through their agents with ordinary laymen who may not be expected to know the technical meaning of policy terms. See, also, LSA-C.C. art. 1946.[5] Likewise, ambiguous language in insurance policies is construed most favorably to the insured

4. In this annotation at 166 A.L.R. 469 (1946), 23 State jurisdictions (including Louisiana) are indicated as drawing the distinction between "accidental means" and "accidental results" in the construction of the clause in question (see footnote 7 therein), and 14 State jurisdictions as having denied the distinction or repudiated earlier jurisprudence having drawn the distinction (see footnote 20 therein).

5. As was stated with regard to the present clause, 166 A.L.R. 478: " * * * Certainly, as a practical matter, it can safely be said that the average person taking out accident insurance assumes that he is covered for any fortuitous, undesigned injury, and it can hardly be wondered at that the average person purchasing a policy from an insurance company—even if such person had the time, means, acumen, and energy to cope with the matter thoroughly—has no conception of the judicial niceties of the problem and no idea of what coverage he is not getting under the term 'accidental means.' * * * "

and against the insurer defendant which prepared the contract. See LSA–C.C. art. 1957. See, e. g., Powell v. Liberty Industrial Life Ins. Co., 197 La. 894, 2 So.2d 638; Lewis v. Liberty Industrial Life Ins. Co., 185 La. 589, 170 So. 4, 107 ·A.L.R. 286.

■ Rather than perpetuate the extremely technical distinction of the Parker case (so at variance with the usual rules of interpretation of insurance contracts utilized by Louisiana jurisprudence), which theoretically excludes from coverage accidental deaths that allegedly are only the "accidental results" of an intended act, we think it preferable to construe the present policy clauses in accordance with the common and usual significance attached by general and popular use to the language in question, LSA–C.C. art. 1946; so that, under these clauses, recovery is allowable for accidental death, whether or not the precipitating act which accidentally produces this fatality was itself voluntary and intended (subject, of course, to the other policy limitations.)

■ In those jurisdictions which have, as we do now, repudiated the distinction between "accidental means" and "accidental results", the test "is whether the average man, under the existing facts and circumstances, would regard the loss so unforeseen, ·unexpected, and extraordinary that he would say it was an accident." Preferred Accident Ins. Co. v. Clark, 10 Cir., 144 F.2d 165, 167. Applying the

above test in factual situations similar to the present, where the insured died from an injection of novocaine to which he was hypersensitive, Mutual Life Ins. Co. of New York v. Dodge, 4 Cir., 11 F.2d 486, 59 A.L.R. 1290, or where the insured died from shock when a needle was inserted into his vein for a blood transfusion, American Nat. Ins. Co. of Galveston, Tex. v. Belch, 4 Cir., 100 F.2d 48, recovery of double indemnity death benefits was allowed pursuant to clauses similar to or identical with the present, the courts holding that "a result which is not the natural or probable consequence of the means which produced it, and which the actor did not intend to produce, is produced by accidental means," 100 F.2d 50, 51. We think that in the present case the decedent's death was produced by accidental means within the meaning of the policy as determined by the above-stated criteria based upon the ordinary (rather than a specialized or technical) meaning of the language used in the policy, and that therefore recovery herein must be allowed.

For the above and foregoing reasons, the judgment below dismissing plaintiffs' suit is reversed.

It is ordered, adjudged and decreed that there be judgment herein in favor of plaintiffs, Mrs. Katie Gaskins, Widow of Clarence E. Schonberg, Mrs. Frances Ruth Schonberg, Wife of William J. Stewart, and Irvin H. Schonberg, and against the

defendant, New York Life Insurance Company, in the full sum of $5,000, subject to the terms and conditions of payment of the policies sued upon and of valid trust agreements executed by the decedent in connection therewith.

It is further ordered, adjudged and decreed that there be legal interest on all unpaid amounts from the date when payment of such became due under the policies (that is, when due proof of decedent's death was received by defendant insurer), cf. Neider v. Continental Assur. Co., 213 La. 621, 35 So.2d 237, 2 A.L.R.2d 846, and trust agreements, until paid.

Reversed.

HAWTHORNE, J., absent.

104 So.2d 428