143 So.2d 597 (1962)
Leon LIPRIE, Individually, and on behalf of his minor son, Anthony J. Liprie, Plaintiff and Appellee,
v.
MICHIGAN MILLERS MUTUAL INSURANCE COMPANY, Defendant and Appellant.
No. 620.
Court of Appeal of Louisiana, Third Circuit.
July 5, 1962.
Rehearing Denied July 27, 1962.
Certiorari Denied October 5, 1962.
*598 Hall, Raggio & Farrar, J. L. Cox, Jr., and Thomas L. Raggio, Lake Charles, for defendant-appellant.
Nathan A. Cormie & Chris J. Roy, Lake Charles, for plaintiff-appellee.
Before TATE, CULPEPPER and HOOD, JJ.
HOOD, Judge.
This is an action for damages instituted by Leon Liprie, individually and as administrator for the estate of his minor son, Anthony J. Liprie. Plaintiff alleges that his wife, Mrs. Betty Lou Liprie, was negligent in leaving their infant child, Anthony J. Liprie, unattended in a bathtub, and that as a result of her negligence the child turned on the hot water faucet in the tub and sustained severe burns. The suit was instituted against Michigan Millers Mutual Insurance Company, plaintiff alleging that at the time this accident occurred his wife was an "insured" under an insurance policy which had been issued by said defendant and which included personal liability coverage.
After issue was joined the case was tried by jury and the trial resulted in a verdict for plaintiff, as administrator of the estate of his minor child, for the sum of $32,500.00, with interest. A judgment in accordance *599 with that verdict was rendered and signed, and defendant has appealed from that judgment. No answer has been filed to the appeal.
The evidence establishes that plaintiff's father, Mr. Anthony P. Liprie, constructed a residence building in Lake Charles during the year 1959. This building, all under one roof, included a double garage and an area containing a bedroom, a bathroom and a kitchen located near the rear of the house and separated from the other rooms of such house by the garage.
In January, 1960, after this building was completed, it was occupied by the senior Mr. Liprie and his immediate family, consisting of his wife and his three minor children, and also by his married son, Leon Martin Liprie, the plaintiff in this suit, and plaintiff's family which consisted of his wife, Mrs. Betty Lou Liprie, and his infant son, Anthony J. Liprie. Plaintiff and his wife and child moved into the three-room area in the rear of the building, and the senior Mr. Liprie and the other members of his family occupied the balance of the house.
A policy of insurance covering this dwelling was issued by defendant insurance company about the time the house was occupied, which policy included comprehensive personal liability coverage for the named insured, Mr. Anthony P. Liprie, and for others insured under the terms of the policy. This policy was in effect at the time the accident hereinafter described occurred.
On the morning of October 4, 1960, plaintiff's wife was bathing her nine-month old son, Anthony J. Liprie, in a bathtub located in the bathroom of the three-room area in the rear of the Liprie house. Her husband, plaintiff, was outside working on a car. Mrs. Liprie left the bathroom and let the child play in the tub while she performed some household chores in her kitchen. She returned to the bathroom about five minutes later and found her son sitting in the rear of the tub playing with a washcloth and some bath toys, and at the same time she noticed that all of the water had drained out of the tub, it being obvious to her that the child had moved to the front of the tub and had opened the drain and had then returned to the rear of it. Mrs. Liprie then left the bathroom again to go to the main portion of the house to see her mother-in-law. About 10 minutes later plaintiff, upon hearing the cries of the baby, went into the house and found the child sitting in the tub with the hot water running, there being about eight or ten inches of very hot water in the tub at that time. The child was then removed from the tub and was rushed to a doctor and to the hospital for treatment. The child sustained severe burns to the lower portions of his body, for which plaintiff in behalf of such child seeks to recover damages from defendant. Plaintiff contends that the injuries sustained by the child were caused by the negligence of the mother, Mrs. Betty Lou Liprie, and that the mother was an insured under the policy issued by defendant.
The first important issue presented is whether Mrs. Betty Lou Liprie was an "insured" under the terms of the policy which had been issued by defendant. The "named insured" under the policy which was then in effect was the owner of the house, Anthony J. Liprie, but under the Comprehensive Personal Liability coverage the insurer obligated itself to pay on behalf of the "insured" all sums which the insured shall become legally obligated to pay as damages because of bodily injury. The policy defines an "insured," as follows:
"1. Definition of Insured: The unqualified word `Insured' includes (a) the named Insured, (b) if residents of his household, his spouse, the relatives of either and any other person under the age of 21 in the care of an Insured * * *."
Under the above quoted provision of the policy, Mrs. Betty Lou Liprie must be classified *600 as an "insured" if: (1) she is a relative of the senior Mr. Liprie or his wife and is a resident of his household; or (2) she is under the age of 21 in the care of an insured and also is a resident in the household of the named insured, Mr. Anthony P. Liprie.
Defendant contends that Mrs. Betty Lou Liprie was not an insured under this policy because she was not a "resident" of the household of the named insured, that she was not a "relative" of the senior Mr. Liprie or his wife, and that she was not a "person under the age of 21 in the care of an insured."
Plaintiff was 17 years of age and his wife was 16 at the time this accident occurred. They were married in 1959 and they lived with plaintiff's father continuously from the time of their marriage until after this accident occurred. Plaintiff was unemployed during all of that time, except for a period of about two weeks, and he had never been able to support himself or his family. He not only resided in his father's home, but he and his family were being supported completely by the senior Mr. Liprie. Although plaintiff and his wife and child occupied the three-room area in the rear of the house, they ate all of their meals with the senior Liprie family, all of the groceries were purchased by plaintiff's father and both families had free access to all parts of the house. Under those circumstances we conclude that Mrs. Betty Lou Liprie was a resident of the household of the named insured, Mr. Anthony P. Liprie. We have carefully reviewed the case of Leteff v. Maryland Casualty Company, La.App. 1 Cir., 91 So.2d 123, which has been cited by defendant, and we find nothing in that opinion which we think is inconsistent with the conclusions we have reached here.
The next question presented is whether the mother of the child was a "relative" of Mr. Anthony P. Liprie or his spouse. The evidence shows that there was no blood relationship between Mrs. Betty Lou Liprie, on the one hand, and Mr. or Mrs. Anthony P. Liprie, on the other, the only relationship between them being by affinity. The mother of the child, whose alleged negligence is the basis for this tort action, was the daughter-in-law of the named insured and his wife. Defendant contends that the word "relatives," as used in the definition of "Insured" in the policy, refers only to blood relatives or to those related to each other by consanguinity.
An insurance policy is a contract, and the rules established for the construction of written instruments apply to contracts of insurance. Hemel v. State Farm Mutual Automobile Insurance Company, 211 La. 95, 29 So.2d 483. The words used in such a contract are to be understood in the common and usual signification, without attending so much to grammatical rules, as to general and popular use. LSA-C.C. Art. 1946. Also, all ambiguities in the provisions of an insurance policy are to be construed in favor of the insured and against the insurer, subject to the qualification that if the intent of the policy is clearly evidenced by the terms of the contract, then the policy must be given a reasonable interpretation with relation to such intent. Hemel v. State Farm Mutual Automobile Insurance Company, supra; American Manufacturing Corporation v. National Union Fire Insurance Company, 203 La. 515, 14 So.2d 430; Schonberg v. New York Life Insurance Company, 235 La. 461, 104 So.2d 171; Monteleone v. American Employers Insurance Company, 239 La. 773, 120 So.2d 70.
In Black's Law Dictionary, 4th Ed., and in Webster's Third New International Dictionary, the word "relative" is defined as, "A person connected with another by blood or affinity." The American College Dictionary, Random House, defines the term as, "One who is connected with another or others by blood or by marriage."
We think the law which should be applied here was correctly stated in the recent *601 case of Fidelity and Casualty Company of New York v. Jackson, C.C.A. 4 Cir., 297 F.2d 230. In that case the primary question presented was whether the mother-in-law of the defendant was a "relative," under the provisions of an automobile liability policy which excepted coverage of an automobile owned by a "relative" residing with him "in the same household." In holding that the insured and the mother-in-law were relatives, within the meaning of the policy, the Court said:
"The word `relative' denotes both those connected to a person by blood, and those connected by marriage. The Oxford Dictionary defines a relative as `One who is connected with another or others by blood or affinity'. Vol. VIII (1933 ed.) at p. 397. According to Webster's New Collegiate Dictionary (1959 ed.), a relative is `A person connected with another by blood or marriage; a kinsman or kinswoman'. * * *
* * * * * *
"Initially it is argued that if `relative' embodies all persons having a relationship to the insured through marriage, the effect is so to enlarge the exemption as to include car owners only barely and remotely touching the insured through affinity. The implication is that this possibility renders the exception unenforceable as unreasonable. Assuming it would be a valid objection in law, the answer here is immediate and twofold. Primarily, a son-in-law and a mother-in-law are about as close as is conceivable in degree of affinity. The apprehended danger of undue extension of the exception is here only hypothetical. Secondly, the latitude of the stipulation is severely straitened by the further requirement that the `relative' be `a resident of the same household' as the insured.
* * * * * *
"In fine, the meaning of `relative' is amply delimited by the close affinity between the insured Jackson and his mother-in-law, by the restrictive phrase `of the same household' and by the plan of the policy, and so the word lies beyond the need for judicial interpretation."
A review of the many definitions of the words "relation" and "relative" contained in Words and Phrases, Vol. 36A, pp. 391 et seq., indicates to us that these words, when used in insurance contracts and where no other specific definition is given, are generally interpreted as including persons who are related by affinity or marriage as well as by blood or by consanguinity. See also 76 C.J.S. Relative pp. 623-625.
Applying the usual, customary and generally accepted interpretation of the word "relative" to the contract of insurance being considered here, we conclude that Mrs. Betty Lou Liprie is a "relative" of her father-in-law, Mr. Anthony P. Liprie, the named insured, as that term is used in the policy, and that since she also was a resident of his household at the time the accident occurred she is included as an "insured" under the personal liability provisions of that policy.
Defendant further contends that there was no negligence on the part of the mother, Mrs. Betty Lou Liprie. The evidence shows that the mother had been bathing her child in the bathtub for a period of about two weeks prior to the date of the accident, and during that time she had determined that the child could not stand up in the tub unless the sliding shower doors were placed in such a position that he could support himself by putting his arm over the side of the tub. She testified that when she left her child just before this accident occurred, she had placed the shower doors in such a position that he could not stand up in the front portion of the tub where the water faucets were located, and that he could not reach the handles to *602 the faucets while sitting. Mrs. Liprie also testified that although the child had frequently opened the drain permitting the water to drain out of the tub, he had never played with the faucets and had never stood up in the front portion of the tub where the faucets were located. In view of these facts, defendant contends that Mrs. Liprie was not negligent in leaving her child alone in the tub for a period of approximately 10 minutes.
The evidence further shows, however, that although the child may not have been able to walk from the back of the tub to the place were the faucets were located, he was able to slide or crawl to the front of the tub, and he had frequently done so. The child, in fact, had reached the front part of the tub and had opened the drain during the first five-minute period when he had been left alone, all to the knowledge of his mother. The drain lever was located near and just below the water faucets. The evidence also shows that the child began walking two or three days before this accident occurred.
Since the child had just learned to walk, was able to stand and to reach the faucet handles and had demonstrated that he could move to the front of the tub and liked to operate the drain lever which was located near the faucets, it seems to us that the mother should have foreseen or anticipated that he might turn on the hot water and receive severe burns if left unattended. Under all of the circumstances presented here, we feel that Mrs. Liprie was negligent in leaving her young son alone in the bathtub for this period of time, and that her negligence in that respect was the proximate cause of the accident and resulting injury.
Defendant contends, however, that Mrs. Liprie, because of her extreme youth, should not be held to the same degree of care as would a more mature person. The evidence shows that she was only 16 years of age at that time. In our opinion, however, even a person of that youthful age, and particularly a mother who had cared for her nine month old baby from the time of his birth, should have been aware of the danger of leaving the child unattended in a bathtub for that period of time under the circumstances presented here. We are convinced that Mrs. Liprie had the deep love of a mother for her child, and that she would not consciously have permitted the child to sustain an injury. Nevertheless, under the circumstances presented here, we must conclude that she was negligent in leaving the child alone in the bathtub for such an extended period of time.
The remaining question presented relates to quantum. Although plaintiff demanded judgment in his favor, individually, for special damages consisting of hospital and medical expenses, the trial court sustained a motion to strike from the petition all of plaintiff's individual demands for such damages. Plaintiff has not appealed from the judgment which was rendered by the trial court, he has not answered this appeal and no issue has been raised in this court as to his demands for special damages. No award can be made in this case, therefore, for medical and hospital expenses, and we are concerned only with the amount awarded for the injuries sustained by the child, for his pain and suffering and for the disfigurement which has resulted from those injuries.
The jury awarded plaintiff, as administrator of the estate of his minor child, the sum of $32,500.00 for the injuries sustained and for pain and suffering. The injuries consisted of second and third degree burns of both feet and the lower part of both legs, both buttocks, the lateral portion of the left thigh, the genitalia, and the right thigh posterially. These burns covered between 20 and 25 percent of the body surface of the child. The child was hospitalized immediately, he was seriously ill for the first 48 or 72 hours, he had convulsions the day following his burn, and at one time during the first three days there was danger of the child losing his life. He responded well to treatment, however, and *603 after the first 72 hours he progressed well. On October 25, split thickness skin grafts were performed under a general anesthetic on the areas of third degree burns, and the child was discharged from the hospital on November 5, 1960, or 32 days after the accident occurred.
In due course the burns on the child completely healed and, according to the treating physician, Dr. Leonard K. Knapp, he has no residual disability. A considerable amount of scar tissue, however, has been left on both feet, the lower part of both legs, and on his left thigh and buttocks. Also, large keloids have formed on portions of the buttocks and on the lateral portion of his left thigh, extending from his hip downward to the knee. The keloids, or excessive scar tissue, are thick, are somewhat discolored at the present time, are very noticeable, and that on the left thigh causes considerable itching. Also, the pulling of the scar tissue on the upper part of his feet causes the three middle toes on each foot to be slightly elevated above the others, although the medical evidence is convincing that this causes no disability and will not interfere with his walking or engaging in any other activities requiring the use of his feet.
Although the child walks normally and has no disability, Dr. Knapp recommends that additional skin grafts be performed to remove all of the scar tissue and keloids on his buttocks, his thigh and his feet, which surgery should relieve all of the itching, greatly improve the appearance of the burned areas, and allow his toes to resume their normal positions. According to the doctor, two or three surgical procedures would be required in order to accomplish these results and the child would be hospitalized for a period of one or two weeks on each such occasion. Following the skin grafts, the layer of skin which covers the burned areas will be a little thinner than the original skin, it will be susceptible to injury with a little less trauma and it might heal somewhat more slowly than normal skin.
There is some contention made by plaintiff that because of the scar tissue the child may not be able to pass physical examinations for employment after he reaches adulthood. That contention, however, is based on speculation and we think it is not supported by the evidence.
Dr. Knapp summed up the injuries sustained by the child, as follows:
"A. First off, by function results we mean does the child have good use of all the extremities? Is the child able to carry out normal daily activities that other children do? I say from a functional standpoint, the child has no particular disability. There is some extension of the toes on each foot, but otherwise there is a full range of motion in each of the joints and there is no limitation of motion or activities on the part of this child. Now, from a cosmetic standpoint, certainly there are areas that can be improved, particularly this area of keloid formation extending from the left buttock down the lateral aspect of the thigh. This area was not grafted originally. It healed in with scar tissue from skin that was not deeply burned, and left the child with a rather large and thick area of scar tissue, which we call keloid, and there are other areas around the ankie and on the tops of the feet which would be improved in appearance by other grafting procedure.
"Q. But from a functional point of view, as far as use and so forth, you feel that the child can carry on any normal activity.
"A. Yes, I think the child can.
"Q. Did I understand you to testify, Doctor, on the occasions when you saw the child and visited with him in your office and so forth, that as far as you could see the child appeared to walk normally?
"A. Yes, he did.

*604 "Q. Insofar as the cosmetic defect, that is the appearance of the scars are concerned, as the child grows older will the scars have a tendency to take on a more normal color or blanche out or whatever the term is that you want to use?
"A. I believe that there will still be some blanching occur in the scars, although it has been fourteen months, or perhaps a little longer, but there still will be some changes in the scars with some slight improvement in their appearance. However, I do not believe that it will change in thickness but the appearance, perhaps, might improve a little bit.
"Q. That thickened area is the area which you said could be improved or corrected by a transplant?
"A. That's correct."
The evidence convinces us that the child suffered severely at the time the injuries were sustained, and that further surgery and skin grafts will be required to remove at least some of the keloids and scars which have formed. We also are convinced, however, that the child has suffered no functional disability, and that he should lead a normal life even if these surgical procedures are not performed.
In determining the amounts which should be awarded each case must be determined on its own facts, although the court should endeavor to maintain some degree of uniformity in cases involving similar injuries and disabilities. Counsel have referred us to a number of cases in which awards were made for injuries which they contend are similar in some respects to the one which we are considering here. No useful purpose would be served, however, by discussing each of these cited authorities.
After considering all of the evidence, we conclude that the award made in this case is excessive and that it should be reduced. In our opinion an award of $20,000.00 would be fair and adequate for the injuries sustained by this child, for his physical pain and suffering, and for the disfigurement which has resulted from the burns.
For the reasons herein assigned, therefore, the judgment of the district court is amended by reducing the award from $32,500.00 to the sum of $20,000.00, and in all other respects the judgment is affirmed. All costs of this appeal are assessed to defendant-appellant.
Amended and affirmed.

On Application for Rehearing.
En Banc. Rehearing denied.