lxMARVIN, Chief Judge.
The daughter of decedent, as administrator of his succession, and decedent’s employer’s worker’s compensation insurer who paid benefits including medical expenses, appeal a judgment rejecting their respective demands for benefits provided in the defendant’s major medical policy that became effective at 12:01 a.m. July 26, 1986.
The issues are primarily factual: Did the decedent’s injury that resulted in his death about ten months later occur before or after *1328 July 26, 1986, and was the decedent’s injury [or sickness, as the policy also provides] covered by the Louisiana worker’s compensation law? On circumstantial evidence, the trial court decided both issues against the appellants.
PREFACE
We shall emphasize the pertinent policy language. The coverage clause in the major medical policy obligates the defendant insurer (Time) to pay “for Covered Charges which result from injury or sickness based on the policy provisions.”
Injury is defined as “accidental bodily injury sustained while this policy is in force,” meaning, as Louisiana case law on insurance coverage issues has consistently held, “accidental from the insured’s standpoint.” Schonberg v. New York Life Insurance Company, 235 La. 461, 104 So.2d 171 (1958); Willis v. Tipton, 593 So.2d 435 (La.App.2d Cir.1992).
Sickness is defined as “a condition which manifests itself while this policy is in force.”
_JjA pre-existing condition, which is excluded from coverage, is defined as “a sickness, injury, disease or physical condition ...” which was either diagnosed or medically treated before the effective date of coverage, or which caused symptoms before the effective date of coverage “clear enough to cause an ordinarily prudent person to seek medical care or treatment.”
The policy also excludes from coverage “injury or sickness covered by any Worker’s Compensation ... Law.”
We review the record factually in the light that most favorably supports the trial court judgment. Theriot v. Allstate Ins. Co., 625 So.2d 1337 (La.1993); Harrison v. Myers, 25,902 (La.App.2d Cir. 6/22/94), 639 So.2d 402.
Before discussing the facts, we note appellants argue that the injury which this decedent suffered was a sickness that manifested itself after 12:01 a.m. on July 26, 1986. Appellants reason that the above policy definitions state that sickness is a condition which includes, by the definition of pre-exist-ing condition, an “injury ... or physical condition” that was either manifest or diagnosed, or which caused symptoms that would have been “clear enough to cause a ordinarily prudent person to seek medical care or treatment.” At this juncture we emphasize that a pre-existing condition, including an injury, is defined in the policy to exclude coverage of an injury sustained or sickness that manifested itself which would be covered by the policy except when the injury was sustained or sickness manifested itself before the policy became effective.
Interpreting the above policy language as requiring proof that the decedent’s injury occurred during the policy period, and finding as a fact thatjjthe injury more probably than not predated the effective date of the policy, the trial court found that appellants failed to carry their threshold burden of establishing that their claim was covered under the policy. Even assuming that burden was met, the court found the policy exclusion for work-related injuries applicable.
Appellants’ assignments of error on appeal track their arguments in the trial court. Our review of the record leads us to agree with the trial court that appellants had, and failed to carry, the burden of proving that decedent’s injury occurred during the policy period.
Finding no error, legal or factual, in the trial court’s ruling that the claim was not covered under the policy, we affirm the judgment without addressing the applicability of the policy exclusion for work-related injuries.
FACTS
The decedent was John F. Coddington, a 51-year-old frugal Shreveport businessman who, as an executive officer and principal shareholder, was engaged in several corporate ventures, one of which Louisiana Waterproofing, Inc. (LWP). He may be described *1329 as a “workaholic” and a “phoneaholic” who arose early and worked late, devoted to keeping in touch with business associates and employees and family. For LWP, he left from Shreveport on Saturday, July 17, 1986, to go to Cheyenne, Wyoming, to oversee an LWP job, intending to return to Dallas on July 23 to meet an LWP job foreman, James Bartish, who was to accompany Coddington to another LWP job site in Miami on Thursday, July 24.
LCoddington spent the night of Tuesday, July 22, in Fort Collins, Colorado, with his adult daughter, Kathy Lightfoot, who drove him to the Denver airport on July 23 to board an afternoon flight to Dallas. He wore jeans and a black shirt with zippers. Shortly after his flight from Denver arrived in Dallas about 5:30 p.m., he telephoned Bartish at 5:40 p.m., asking him to meet him at 8:00 a.m. the next morning at the Howard Johnson motel on the North Central Expressway where he would be staying. They were to discuss plans for the Florida job and for boarding the flight together to Miami that Thursday afternoon. On business trips Cod-dington usually stayed at moderately priced hotels such as Howard Johnson’s.
The cab driver who drove Coddington from the Dallas airport on Wednesday said that Coddington inquired about a hotel or motel that offered exercise equipment or facilities to its guests. The cab driver suggested the Fairmont Hotel, a higher priced downtown hotel where Coddington and his wife sometimes stayed when celebrating an anniversary or birthday. Coddington checked into the Fairmont at 6:40 p.m. on Wednesday, July 23.
He apparently had no trouble filling out his registration card or getting to his room, where he began making long distance phone calls about ten minutes later. Coddington attempted or made eight telephone calls in 35 minutes between 6:49 and 7:24 p.m.: three to his wife, whom he was unable to reach either at home or at her place of work, one to the home of his daughter, Jeanne Marie Light-foot Smith, LWP’s office secretary, who gave him the messages she had taken for him at the office that day, and four to various LWP business associates.
IsTo all who had personal or telephone contact with Coddington on Wednesday, July 23, including his Colorado daughter, Bartish, the cab driver, hotel employees and others, Coddington was coherent, normal, and gave no indication of having been injured or impaired in any way. The recipients of the telephone calls Coddington made from his hotel room said he “sounded like himself.”
Coddington apparently did not tell any of his family members or business associates where he was staying while in Dallas. According to his phone records, he made no more phone calls on any day after 7:24 p.m. on Wednesday, July 23. His reputation as a “phoneaholic” was verified by evidence that he had made almost 40 long distance calls in the 24 hours preceding his last call on July 23, and had made over 100 calls after he left Shreveport for Wyoming on July 17, some as early as 5:00 a.m. and as late as 10:00 p.m. during those six days.
Coddington missed his 8:00 a.m. appointment with Bartish, and his scheduled afternoon flight to Miami, on Thursday, July 24. After determining that Coddington was not registered at the Howard Johnson’s, where he had said he would be staying, and after Coddington failed to meet him at the airport, Bartish called LWP’s office in Shreveport, only to learn that no one there had heard from Coddington on July 24. Coddington generally called his office several times a day while out of town on business, and was always punctual for business meetings and appointments.
Earlier in July, Coddington had made a July 24 appointment with a tailor at a Dallas clothing store to pick up some suits he had ordered for use in |6another business venture, Tri-Con Development, Inc., which was in the early stages of building a country club near Tylertown, Mississippi. Coddington did not keep the scheduled appointment with his tailor.
Around noon on Thursday, July 24, a Fair-mont housekeeping employee who entered *1330 Coddington’s hotel room after receiving no response to her knocks, found him “laid out” on the bed, on top of the bed covers, wearing a pair of gym shorts and a “flowered print sport shirt.” According to the maid, the room “looked like someone had just checked in.” The maid noted the bed was still made, the towels had not been used, and it appeared that the guest’s luggage had not been unpacked.
After determining that the guest was breathing, and noticing no visible sign of injury or distress, the maid left the room without attempting to clean it, assuming the guest was simply sleeping. Coddington, however, was an early riser, according to his family, and did not sleep in the middle of the day.
A housekeeping supervisor told police that she knocked on the door of Coddington’s room around 3:30 p.m. on July 24, again offering maid service, and heard a male voice respond, “We don’t need any.” This employee did not testify, by deposition or otherwise, in the trial court.
Testimony of other housekeeping employees differed as to whether, when and by whom a “Do Not Disturb” sign was placed on the door of Coddington’s room. The sign was apparently on the door on Friday, July 25, causing the maids and supervisors who were on duty that day to bypass the room without attempting to clean it. Neither the maid nor the supervisor who reported having seen or heard someone in the room on Thursday, July 24, had 17any contact with the room thereafter, being either assigned to a different floor of the hotel, or off duty, on Friday and Saturday, July 25 and 26.
Coddington’s family in Louisiana, which included his wife, Sue, and his daughter, Jeanne Marie, in Shreveport, as well as two sisters, one in Baton Rouge and one in Hammond, became concerned about him after Bartish’s call and when Coddington did not make telephone contact with anyone on Thursday, July 24. The family made over 60 phone calls on Friday, July 25, to Dallas and elsewhere in a fruitless attempt to locate Coddington. Mrs. Coddington reported her husband missing, to both the Dallas and Shreveport Police Departments, on Friday, July 25.
About 2:00 p.m. on Saturday, July 26, Cod-dington appeared in the lobby of the Fair-mont in a dazed condition, but with no visible signs of injury. He was then dressed in jeans and a white shirt, and was carrying two duffle bags. His clothes looked disheveled and he had not shaved for a few days, contrary to his custom of being meticulous about his appearance. Coddington was unable to identify himself or otherwise communicate with employees at the front desk, who called for assistance from hotel security.
The security officers, not realizing that Coddington was a registered guest of the Fairmont, and apparently believing he was inebriated, said they heard Coddington say something that sounded like “Hyatt.” They escorted him out the side entrance of the hotel, where either he or they hailed a cab to take him to the Hyatt Regency Hotel, also in downtown Dallas.
Coddington exited the cab at the Hyatt Regency with his two bags but was unable to communicate with hotel workers there. Recognizing his need |8for medical attention, Hyatt employees called for an ambulance, which took Coddington to the emergency room at Parkland Memorial Hospital.
MEDICAL EVIDENCE
The hospital doctors who examined Cod-dington at about 3:30 p.m. on July 26 found him to be disoriented as to person, place and time, and unable to respond appropriately to their questions about what had happened to him. X-rays revealed a nondepressed fracture of the left parietal bone of his skull, just behind his left ear. He had a bruise in the area of the fracture, and internal bleeding behind both eardrums, but no cuts, bruises, or other external signs of injury on any other part of his body.
A CT scan of Coddington’s brain on July 26 showed massive contusions, or bruises, *1331 some to the back portion of his brain on the left side (left parietal and temporal lobes), in the area of the skull fracture, and others to the front of the brain on both sides (frontal lobes). The CT scan also showed a slight shift or movement of brain tissue from left to right, which occurs when tissue on the left side of the brain swells.
Coddington’s condition showed little change on a CT scan taken the next day, Sunday, July 27. He continued to give inappropriate or unintelligible verbal responses to questions about what had happened to him.
On Monday morning, July 28, Coddington began having severe respiratory problems and went into a coma. A third CT scan showed that the swelling of his brain tissue had increased to a life-threatening level. The left frontal and temporal lobes of his brain, which were no longer functioning, | gwere surgically removed on July 28, to relieve pressure inside the skull from the swelling tissue.
A postoperative CT brain scan taken on July 28 showed an area of infarction, or tissue death as a result of blood deprivation, in the left occipital lobe, below the area of the skull fracture, which apparently occurred when the posterior cerebral artery was compressed by the left-to-right shift of the swollen brain tissue.
Coddington was placed on a mechanical ventilator after the surgery. His brain continued to swell for another eight days, or until about August 7, notwithstanding the use of medication and hyperventilation to control the swelling.
A week later, August 13, 1986, Codding-ton’s condition had sufficiently stabilized to allow him to be moved from Parkland Hospital in Dallas to Sehumpert Medical Center in Shreveport, where his family was. Codding-ton was eventually transferred to a public hospital in Shreveport, LSU Medical Center, where he died May 7, 1987. He remained comatose throughout his hospitalizations, unable to tell what had happened to him.
POLICE INVESTIGATION
Coddington’s family learned he was at Parkland Hospital shortly after he arrived there on Saturday afternoon, July 26, 1986. That evening, after learning of Coddington’s whereabouts and condition from officers who responded to the initial call for help by Hyatt Regency employees, the Dallas Police Department began its investigation, suspecting a possible aggravated assault on Coddington after his arrival in Dallas on July 23.
| ipThe investigating officer, Monty Monci-bais, interviewed numerous individuals who had or may have had contact with Codding-ton in Dallas, including the airport cab driver who drove him to the Fairmont, hotel employees at the Fairmont, the Hyatt Regency and the Howard Johnson’s, and Bartish, the LWP job foreman that Coddington was scheduled to meet in Dallas. The statements from these individuals have been incorporated into our summary of the facts.
Moncibais circulated Coddington’s photograph in bars, restaurants, and exercise facilities in and around the Fairmont. No one reported having seen Coddington, alone or in the company of anyone else, during his stay in Dallas. No food or beverage charges appeared on Coddington’s hotel bill, and no receipts for meals, transportation or other incidental expenses after July 23 were found in his belongings.
Coddington still had the personal jewelry he usually wore (watch, wedding ring, etc.), and his wallet, containing his credit cards and an amount of cash consistent with what he usually carried, when he arrived at Parkland Hospital. His family did not report anything missing from his luggage, except perhaps a rubber-coated dumbbell, which some family members claimed he generally took with him on business trips. Others maintained he did not take the dumbbell because it was too small for efficient exercise.
There was no evidence of a struggle in Coddington’s room at the Fairmont. A black T-shirt in his luggage (not the black zippered shirt he wore when he arrived in Dallas) was *1332 stained with what appeared to be dried vomit, but no traces of drugs or alcohol were found either in the stain residue or in a | ntoxicology screen of Coddington’s blood that was performed shortly after his arrival at Parkland Hospital. According to the doctors, vomiting sometimes occurs in patients with head injuries.
After reviewing the available lay and medical evidence about the cause of Coddington’s injury, which evidence was entirely circumstantial, the Dallas Police Department closed its file, finding no evidence of foul play, even after investigating several theories of foul play suggested by Coddington’s sisters.
TIME AND CAUSE OF INJURY; EXPERT TESTIMONY
The doctors who treated Coddington in Dallas and in Shreveport and the Caddo Parish coroner who performed an autopsy agreed that Coddington’s closed head injury was caused by external trauma, but reached differing conclusions about how the injury occurred. Some doctors opined that Cod-dington fell and struck his head on a stationary object, while others opined that his head was struck or assaulted by a moving object. For purposes of this appeal, the injury was an “accidental” injury insofar as concerns the coverage question, even if it was intentionally inflicted by another person. See authorities cited in the PREFACE, supra.
The doctors also gave differing opinions as to when the injury occurred, the critical material issue for resolution of insurance coverage. The surgical intern at Parkland Hospital, Dr. Charles Hinnant, whose area of expertise was limited to general principles of medicine, and his supervisor, the attending neurosurgeon at Parkland, Dr. Sam Finn, testified that the brain generally reaches its maximum level of swelling about 72 hours after it is injured. Working backwards from Monday, July 28, 1986, when | ^Coddington’s preoperative CT scan showed increased swelling in his brain compared with the brain scans of July 26 and 27, these doctors opined that the injury probably occurred on Friday, July 25 or Saturday, July 26. As mentioned, Time’s policy took effect at 12:01 a.m., Saturday, July 26. Dr. Hinnant, the intern, expressly deferred to the more experienced doctors for fixing the time of Coddington’s injury.
Other doctors downplayed the value of the 72-hour rule. Dr. Philip Megison, the neurosurgery resident at Parkland who treated Coddington, as part of the team that included Dr. Hinnant and Dr. Finn, testified that the 72-hour rule “is a rule of thumb more than anything concrete.” In Dr. Megison’s view, this rule of thumb, by itself, does not definitively tell when a brain injury occurred.
According to the report of the Dallas Police Department, which was prepared within a month after Coddington entered Parkland Hospital on July 26, 1986, Dr. Megison told the investigating officer that Coddington’s injuries “were two or three days old when he entered Parkland on Sat., July 26.” When Dr. Megison’s deposition was taken almost seven years later in March 1993, he testified that he did not specifically recall talking to the police officer, but had no reason to doubt that the officer accurately reported his statements.
When asked in 1993 if he still held the opinion that Coddington’s injuries probably occurred two or three days before July 26, 1986, Dr. Megison answered, “Yes.” He was not asked, on direct or on cross-examination, to state the factual basis for his opinion. According to Dr. | i8Megison, the medical evidence in this case does not, and cannot, pinpoint the exact time of Coddington’s injury. Dr. Megison said he “couldn’t be definitive that the injury ... occurred after 12:01 a.m. on July ... 26, 1986.”
Dr. Jorge Martinez, the Shreveport neurosurgeon who cared for Coddington after his transfer from Parkland to Schumpert, testified that the period of brain swelling after a head injury varies:
... the swelling can occur within the first hours. It could occur within the first ten days. It varies. It could be between
*1333 three and seven or three to ten days.... It depends on many factors....
Q. ... if all the facts you knew were that a person’s brain was swelling on the 28th, that fact alone does not enable you to tell when the brain injury occurred by backdating [72] hours or any longer period or shorter period. Do you agree with that?
A. I agree with that, yes.
Based on the description of Coddington as disoriented and confused on July 26, 1986, and on the deterioration in his condition thereafter, according to the Parkland medical records, Dr. Martinez testified, “It [the time of injury] has to be several days before [July 26, 1986].” Our brackets and emphasis.
Drs. Martinez and Megison were questioned at length about specific changes in Coddingtoris behavior before and after Wednesday, July 23,1986, such as the abrupt and total cessation of telephone calls to his family and to business associates after 7:24 p.m. on July 23, his failure to keep any of the appointments he had scheduled for July 24, without notifying anyone of a change in plans, and his failure to shave for several days before he appeared in the hotel lobby on Saturday, July 26. Both doctors testified that any or all of these changes in Codding-toris normal habits and behavior could be consistent with his having suffered a brain injury before July 26.
JuTRIAL COURT FINDINGS
In reasons for judgment, the trial court concluded that Coddingtoris head injury occurred after he made his last long distance phone call at 7:24 p.m. on July 23 and before Time’s policy took effect at 12:01 a.m. on July 26. The court expressly rejected the “72-hour rule” espoused by some of the doctors as a reliable method of calculating or estimating the time of a head injury, noting that this method was “sharply criticized” by other doctors, whose testimony the court found to be more persuasive.
Relying on the policy definition of injury as one sustained while the policy was in effect, and on the exclusion for pre-existing conditions, the trial court found that the plaintiffs failed to meet their threshold burden of proving coverage under Time’s policy. The court implicitly rejected plaintiffs’ argument that Coddingtoris condition should be regarded as a sickness rather than an injury, for which coverage would be triggered by the time of manifestation, rather than by the time of occurrence.
Alternatively, the court ruled in Time’s favor based on a policy exclusion for “injury or sickness covered by any Worker’s Compensation Act or Occupational Disease Law.” The court noted that Coddingtoris reason for traveling to Dallas, and most of the long distance phone calls he made from Dallas, were related to his executive employment with Louisiana Waterproofing.
| isDISCUSSION

Who Had What Burden of Proof?

Appellants initially argue that the trial court erred in its determination of who had what burden of proof under Time’s policy. Appellants claim they were simply required to prove that Coddingtoris medical expenses were incurred during the policy period to bring their claim within the basic coverage provisions. Having so done, they argue the trial court erred in requiring them to additionally prove that Coddingtoris injury occurred or sickness manifested itself during the policy period, as an essential element of proving basic coverage under the policy. Appellants claim their evidence that the expenses were incurred during the policy period was enough to shift the burden to Time to prove an exclusion from coverage, as, for instance, by showing that Coddingtoris injury or sickness fit the policy definition of a pre-existing condition.
We cannot agree. A simple reading of the policy’s statement of coverage, quoted above in our PREFACE, shows that coverage of charges incurred for injury or sickness is limited to “... injury sustained while this policy is in force,” or “sickness ... which *1334 manifests itself while this policy is in force.” Proof of the time the injury occurred, or the sickness manifested itself, is clearly an essential element of appellants’ threshold burden of proving that their claim falls within the basic coverage of the policy. See and compare Central Louisiana Elec. v. Westinghouse, 579 So.2d 981 (La.1991); Hassen v. Professional Investors Life Ins. Co., 503 So.2d 1030 (La.[App.i6 2d Cir.1987); and Davidson v. United Fire & Cas. Co., 576 So.2d 586 (La.App.4th Cir.1991).

Was Coddington’s Condition a “Sickness” Rather Than an “Injury”?

Appellants’ next argument, which we have generally summarized above, is that the policy definitions of injury, sickness and pre-existing condition are sufficiently ambiguous to allow the “injury or physical condition” from which Coddington suffered when he was admitted to Parkland Hospital, after the policy took effect, to be regarded as a sickness, for which coverage depends on the time of manifestation, rather than as an injury, which must occur during the policy period to be covered.
Construing the policy as a whole, the trial court found no ambiguity in the policy definitions of injury, on the one hand, and sickness, on the other. We agree that the policy, fairly and reasonably construed, is not ambiguous.
A policy provision is not deemed ambiguous unless it is susceptible of two or more equally reasonable interpretations. Sharff v. Ohio Cas. Ins. Co., 605 So.2d 657 (La.App.2d Cir.1992), writ denied. To determine whether policy language is ambiguous, and therefore to be construed in the insured’s favor, courts must interpret the words and phrases under scrutiny in their ordinary and popular sense, fairly and reasonably, and not in a technical, strained or forced manner. Pareti v. Sentry Indent Co., 536 So.2d 417 (La.1988); Sharff, supra; Harvey v. Mr. Lynn’s, Inc., 416 So.2d 960 (La. App.2d Cir.1982); Leonard, Tutrix of Bland v. Continental Assur. Co., 457 So.2d 751 (La.App.lst Cir.1984), writ denied.
| i7The word injury, in its ordinary sense and meaning, and in the context of bodily injury, as the term is further defined in the policy, connotes hurt, damage or harm to the human body or some member thereof by contact with some external force or violence. Bergquist v. Fernandez, 535 So.2d 827 (La.App.2d Cir.1988); Nickens v. McGehee, 184 So.2d 271 (La.App.lst Cir.1966), writ denied. See also Webster’s Third New International Dictionary (G. & C. Merriam Co., 1971). Here an injury is one “sustained while this policy is in force.”
The ordinary meaning of sickness, according to this and other dictionaries and the popular understanding of the word, is an illness or disease. Here a sickness is “a condition which manifests itself while this policy is in force.”
Everyone agrees that Coddington’s skull fracture and massive brain contusions, the injuries that were sustained, were caused by external trauma. Within the factual context of this record, the “condition” which required the insured’s hospitalization was clearly from an injury that was sustained and not from a sickness that manifested itself. Any abstract or hypothetical ambiguity in the policy terms, when read in the manner suggested by appellants, disappears and becomes patently unreasonable when the terms are understood in their plain and ordinary meaning, and in light of the facts that gave rise to the claim under the policy. Compare Sharff and Leonard, both cited supra. See CC Arts. 2045-2057.
[ jaWhen Did the Injury Occur?
Having found no legal error in the manner in which the trial court interpreted the policy provisions and allocated the respective burdens of proof of the litigants, we address appellants’ assertion of clear factual error in the court’s finding that Coddington’s injury more probably than not occurred before Time’s policy took effect.
In support of this argument, appellants rely on only two pieces of evidence, one from a lay witness and the other from two of the *1335 doctors who treated Coddington. The expert evidence, in the form of the 72-hour rule regarding brain swelling, was expressly discounted by the trial court in the face of testimony from other, and largely more experienced, doctors who also treated Codding-ton. This record does not reveal any abuse of discretion in the trial court’s exercise of its prerogative and discretion to weigh and assess conflicting expert testimony. Winford Co. v. Webster Gravel & Asphalt, 571 So.2d 802 (La.App.2d Cir.1990).
The lay witness, Patrick White, was the construction foreman at a job site in Shreveport where LWP was performing stucco work in July 1986. White testified that Cod-dington called him from Dallas, to discuss the progress of the work and the need for LWP to submit to White its draw or payment request, at about 8:00 p.m. on Friday, July 25, 1986, only a few hours before Time’s policy took effect. According to White, Cod-dington spoke coherently and clearly, with no sign of injury or impairment, during their telephone conversation. White recalled Cod-dington saying he was calling from a Dallas hotel, where he had “just cheeked in.”
| ^Notwithstanding White’s adamance that he spoke to Coddington on Friday, July 25, and not earlier in the week, other evidence effectively showed that White must have been mistaken in his recollection of when the conversation occurred.
The records of Coddington’s long distance calls from Dallas show no entries after Wednesday, July 23. On that Wednesday, however, according to the telephone records which simply list the numbers that were called, as supplemented by the testimony of Coddington’s sister who later identified the recipient of each of the listed calls, Codding-ton called White at 7:16 p.m., only a few minutes after Coddington called White’s supervisor, Bill Swearingen, at 7:12 p.m. on July 23. Coddington made these calls within about 30 minutes after he checked in at the Fairmont.
Swearingen testified that Coddington called him that Wednesday evening to obtain White’s telephone number, which Coddington had misplaced. Swearingen later verified with White that Coddington had, in fact, called White after obtaining White’s telephone number from Swearingen. This testimony, together with the presence of a long distance charge for the call to White on Wednesday, July 23, the day Coddington checked in at the Fairmont, and the absence of such a charge on any day thereafter, reasonably supports the trial court’s findings that Coddington made no long distance calls, even to White, after July 23, and that the injury for which Coddington was hospitalized occurred before Time’s policy took effect.
JaoDE CRE E
Finding no merit to the assignments of error raised by appellants, we affirm the judgment, at appellants’ cost.