No. 33,305

Marjorie E. Spence, Polly M. Reynolds and Robert L. Eastman, a Minor, by Marjorie E. Spence, His Guardian, *Appellees,* v. The Equitable Life Assurance Society of the United States, *Appellant.*

(69 P. 2d 713)

Opinion filed July 10, 1937.

*Robert Stone, James A. McClure, Robert L. Webb, Beryl R. Johnson, Ralph W. Oman,* all of Topeka, and *Alexander & Green,* of New York, N. Y., for the appellant.

*James E. Smith, Earl H. Hatcher, Frank H. McFarland* and *Clayton M. Davis,* all of Topeka, for the appellees.

The opinion of the court was delivered by

ALLEN, J.: This was an action upon a life insurance policy with a double-indemnity clause. The face amount, or ordinary death benefit, was paid promptly upon the death of the insured, and this action involves the interpretation of the double-indemnity feature of the policy providing for special benefits in the event death results from accidental means. Plaintiffs recovered judgment in the trial court, and defendant appeals.

The policy contained a double-indemnity clause by which the defendant agreed to pay an additional $5,000 in the event death resulted—

"Solely from bodily injuries caused directly, exclusively, and independently of all other causes by external, violent, and purely accidental means, provided that death shall ensue within ninety days from the date of such injuries and shall not be the result of or be caused directly or indirectly by self-destruction, sane or insane, disease or illness of any kind, physical or mental infirmity, or any violation of law by the insured."

The plaintiffs contend that the insured died from an accidental overdose of barbital or paraldehyde, or both, without any intent on his part that death would result, and that the accident consisted of the fact that he did not intend for the amount taken by him to cause any injury. The defendant contends that the insured took what he intended to take and that his death, even if it was unanticipated, was not death by accidental means.

There was evidence tending to show that the insured, prior to May, 1934, had for a number of years been addicted to the use of morphine, and also that he had used paraldehyde and barbital.

There was evidence that for twenty years he had taken morphine; that he was using the drug when the policy was issued to him; that at times he would become unconscious from the use of drugs, and that in 1933, while in Oklahoma City, he received a third-degree burn on his back, which at the time of his death was still an open, running wound; that he had been arrested for acts committed while he was under the influence of drugs; that he had been in the Oklahoma asylum for the drug habit and had taken the Keeley cure

a number of times for the same cause. It appears that in the fall of 1933 the insured left Oklahoma City and removed to a small town in Missouri. The record is silent as to his habits while in Missouri during the winter of 1933-1934. The evidence shows that he appeared at Beatrice, Neb., at the home of his married daughter, Marjorie Spence, in May, 1934. The daughter testified that she had taken training as a nurse and had had experience with drug addicts; that when her father came to Beatrice there was nothing in his manner or appearance to indicate his addiction to drugs. He stayed with his daughter and her husband a few days and they then took him to Lincoln, Neb., where he procured a room. There was evidence that on the following day he was found in a locked bath room unconscious from the use of paraldehyde. He was taken to a hospital, where he remained during the night, and then the daughter and her husband made arrangements for him to stay in a nursing home, where he remained for some time under the attention of a physician. During his stay in the nursing home he took some barbital—some under the orders of the doctor, and probably some not by prescription. He was not confined, and went in and out at will. At that time he still had an open, draining wound on his back, which at times gave him pain and which interfered with his sleep, and required dressing. He made a couple of moves in Lincoln from June to November, 1934. During this period his nineteen-year-old son came to live with him and there was evidence that he was constantly with his father up to the time of his death. There is no evidence that the insured was taking morphine or paraldehyde during the period after the first day of his residence in Lincoln, and there is no evidence of injurious effects during that time from the use of barbital. As to how much of this drug he took there is no evidence, except that on one occasion when he was tired from moving he took five tablets, but as to their drug content there is no evidence that this number of tablets had any injurious effect upon him.

There is evidence that during the period from June to November, 1934, the insured gained in weight, had a good appetite and was apparently in good health. There is no contention on the part of the defendant in this case that the insured committed suicide. Up to the time of his death he was cheerfully planning an automobile trip with his son and a friend to Arizona, where he intended to spend the winter. He purchased a car with which to make the trip, and

on the morning of November 5, 1934, the day before he died, he drew money from the bank and paid his room rent, preparing to leave on this trip within a day or so. The son left him at their lodging about ten o'clock that morning and the insured left the lodging about eleven o'clock. There was some evidence that he had been drinking some that morning. He returned to the lodging about three o'clock in the afternoon in the state of complete collapse and immediately became unconscious. He remained unconscious until the following morning, when he regained consciousness and talked about going on the planned trip within a few days. He said he had taken barbital, but did not know how much. That afternoon he again became unconscious and died about four o'clock in the afternoon. There was no evidence to show how much barbital he had taken in the period between eleven o'clock and three o'clock on November 5; there was no evidence as to the circumstances or conditions under which he took it or why he took it, whether to ease pain or to satisfy some craving for drugs.

There was testimony to show that barbital is a synthetic drug. Some of its many derivatives are luminal, sodium luminal, amytal and sodium amytal. Veronal is another name for it. It is used to produce sleep and to ease pain. The ordinary medicinal dose is five grains, but larger doses may be used legitimately. The average fatal dose is fifty grains. There is testimony that barbital is a preparation which can be obtained in any drug store without a doctor's prescription.

The death certificate executed by the attending physician and filed in the proper public office states that the physician attended the insured from November 5 to November 6, 1934, and that the principal cause of death was barbital poisoning on November 5, 1934, respiratory and cardiac failure on November 6, 1934.

The jury returned answers to special questions and gave a general verdict in favor of the plaintiffs. The jury found by its answer to one question that the deceased did not know that the amount of barbital he took on November 5, 1934, was a dangerous amount or one likely to cause his death. The defendant claims there is no evidence to support this answer. We think that under the testimony as above outlined this was a question for the jury and that there was sufficient evidence to support the finding of the jury.

We have examined the various special questions submitted to the jury and the answers of the jury to such special questions. The

answer to one question was set aside by the court on its own motion on the ground that there was no substantial testimony to sustain it. We think the answers to the other questions were fairly justified by the evidence.

As stated by the defendant, the primary question in the case is whether the acts of the insured as outlined in the testimony above, resulting in his death, constitute "accidental means" within the meaning of the policy.

Defendant argues that there is a distinction between accidental death on one hand and death resulting by accidental means on the other; that the courts have recognized there is a genuine distinction between accidental death, or what might be called the accidental result on the one hand, and the accidental means or cause on the other; that they have held that an unforeseen or unexpected death does not constitute death by accidental means. Many cases are cited to support this contention, including *Sentinel Life Ins. Co. v. Blackmer*, 77 F. 2d 347; *Aetna Life Ins. Co. v. Brand*, 265 Fed. 6, 13 A. L. R. 657; *Lincoln Nat. Life Ins. Co. v. Erickson*, 42 F. 2d 997; *Mutual Life Ins. Co. v. Dodge*, 11 F. 2d 486, 59 A. L. R. 1290; *Ogilvie v. Aetna Life Insurance Co.*, 189 Cal. 406, 209 Pac. 26.

Pursuing this argument, defendant further asserts that the accident complained of in this case, if there was an accident, was not one which related to the means, but that it was only an accidental result. The contention of defendant is stated in the following language:

"The plaintiffs do not contend that Eastman accidentally took barbital in place of something which would not have been harmful. They base their case on an allegation that he took an accidental overdose, but they do not contend that his hand slipped, or that there was any mishap as to the amount which he took. Taking the barbital was a voluntary act on his part. In other words, he took what he intended to take and did not misjudge the amount. The language which they employ must simmer down to the contention that the man died from taking barbital. If he died from it, then of course he took too much if he expected to live."

In support of this theory defendant has collected a large group of cases, including the following: *Rock v. Travelers' Insurance Co.*, 172 Cal. 462, 156 Pac. 1029; L. R. A. 1916E 1196; *Olinsky v. Railway Mail Assn.*, 182 Cal. 669, 189 Pac. 835; *Calkins v. National Travelers' Benefit Assn.*, (Iowa, 1925) 41 A. L. R. 363; *Dark v. Prudential Ins. Co.*, 4 Cal. App. 2d 338, 40 P. 2d 906; *Appel v. Aetna Life Ins. Co.*, 86 App. Div. 83, 83 N. Y. Supp. 238, Affirmed, 180 N.

Y. 514; *Landress v. Phoenix Ins. Co.*, 291 U. S. 491, 54 S. Ct. 461, 78 L. Ed. 934, 90 A. L. R. 1382.

In the recent case of *Bukata v. Metropolitan Life Ins. Co.*, 145 Kan. 858, 67 P. 2d 607, this court had under consideration the question whether death resulting from heat prostration or a heat stroke was death occurring in consequence of bodily injury effected solely through external, violent and accidental means within the meaning of the insurance contract. Many authorities were examined, including the recent case of *Landress v. Phoenix Ins. Co.*, supra, relied upon by the defendant. The dissenting opinion of Cardozo, J., was quoted at length. In the Bukata case this court held that death by heat stroke or heat prostration is death occurring in consequence of bodily injury effected solely through external, violent and accidental means and refused to adopt the attempted distinction between accidental results and accidental means. We are satisfied with the conclusion reached in that case, and believe it is in accordance with the great weight of the authorities.

In *Hodgson v. Preferred Acc. Ins. Co.*, 165 N. Y. S. 293 (Affirmed, 169 N. Y. S. 28), the plaintiff claimed the insured died as a result of morphine poisoning, accidentally produced. In that case the court said:

"Plaintiff's proof tended to show the deceased had taken too much morphine. That gave rise to the possibilities: (1) That he had taken it with suicidal intent; (2) that he had taken the excess quantity intentionally, but not conscious that it would produce a harmful effect; and (3) that he did not intend to take as much as was taken. The suicidal possibility is eliminated by the concession in defendant's brief. As to the possibility that he intended to take all that he did, but did not know it would be harmful, the question arises whether such taking would be an 'accidental means.' Upon this there is a conflict of authority. That such a taking would not be accidental, and that no recovery could be had upon it, is held in *Carnes v. I. S. T. M. Association,* 106 Iowa 281, 76 N. W. 683, 68 Am. St. Rep. 306, and *Lehman v. Great Western Accident Association,* 155 Iowa 737, 133 N. W. 752, 42 L. R. A., n. s., 562. But the contrary has been held in *Dezell v. Fidelity & Casualty Co.,* 176 Mo. 253, 75 S. W. 1102, and *Beile v. Protective Association of America,* 155 Mo. App. 629, 135 S. W. 497. That such a taking is within the policy seems to be the better rule. Cooley, in his Briefs on the Law of Insurance, vol. 4, p. 3156, says:

" 'Strictly speaking, a means is accidental, perhaps, only when disassociated from any human agency; but this narrow interpretation is not recognized in the law of accident insurance.'

"See, also, the definition of 'accident' and 'accidental' in 1 Corpus Juris, 425.

"Death that resulted from internal injuries received by the deceased jumping a short distance was held to be covered by a policy similar to the one in question. (*Mutual Accident Association v. Barry,* 131 U. S. 100-121, 9 Sup. Ct.

755, 33 L. Ed. 60.) So was death resulting from blood poisoning caused by the deceased cutting his corn (*Nax v. Travelers' Insurance Co.,* [C. C.] 130 Fed. 985); and death resulting from coming in contact with poison ivy was held within the policy (*Dent v. Railway Mail Association,* [C. C.] 183 Fed. 840); and injuries received in a scuffle were held to have been the accidental means of the party's death (*Lovelace v. Travelers' Protective Association,* 126 Mo. 104, 28 S. W. 877, 30 L. R. A. 209, 47 Am. St. Rep. 638).

"Poison taken accidentally is within the policy in question. (*Mutual Accident Association of the Northwest v. Tuggle,* 39 Ill. App. 509; *Healey v. Mutual Accident Association,* 133 Ill. 556, 25 N. E. 52, 9 L. R. A. 371, 23 Am. St. Rep. 637; *Travelers' Ins. Co. v. Dunlap,* 59 Ill. App. 515.) So is gas inhaled unintentionally. (*Paul v. Travelers' Ins. Co.,* 112 N. Y. 472, 20 N. E. 347, 3 L. R. A. 443, 8 Am. St. Rep. 758.)"

In *Jensma v. Sun Life Assur. Co.,* 64 F. 2d 457, the court had under consideration a policy covering the insured against bodily injuries suffered solely through external, violent and accidental means. In discussing death by accidental means the court said:

"The appellees insist that 'the death sued on must have occurred as a direct result of a bodily injury effected through accidental means, and it will not suffice if it merely appears that it was accidental in the sense that it could not reasonably have been anticipated.'

"This contention was well disposed of by Judge Sanborn in *Western Commercial Travelers' Ass'n v. Smith* (C. C. A. 8), 85 F. 401, 405, 406, 40 L. R. A. 653. On the other hand, an effect which is not the natural or probable consequence of the means which produced it, an effect which does not ordinarily follow and cannot be reasonably anticipated from the use of those means, an effect which the actor did not intend to produce and which he cannot be charged with the design of producing under the maxim to which we have adverted, is produced by accidental means. It is produced by means which were neither designed nor calculated to cause it. Such an effect is not the result of design, cannot be reasonably anticipated, is unexpected, and is produced by an unusual combination of fortuitous circumstances; in other words, it is produced by accidental means. (*Chicago, St. P., M. & O.*) *Railway Co. v. Elliott,* 12 U. S. App. 381, 386, 387, 389, 5 C. C. A. 347, 350, 351, 353, 55 Fed. 949, 952, 953, 955 (20 L. R. A. 582.)

"The same principle was adhered to by Judge Parker in *Mutual Life Insurance Co. v. Dodge,* (C. C. A. 4) 11 F. 2d 486, 488, 59 A. L. R. 1290, certiorari denied 271 U. S. 677, 46 S. Ct. 629, 70 L. Ed. 1147. In that case the insured's death resulted from paralysis of the respiratory center, caused by the local administration of a drug known as novocaine, preliminary to an operation for the removal of tonsils. The evidence was that the insured was in good health and had no bodily infirmity or disease, except the condition of his tonsils, which admittedly did not contribute to his death. It was admitted that ordinarily novocaine is absolutely harmless, and the evidence was that it proved fatal to the insured, who was a physician, because, unknown to himself and the operating physician, he had an 'idiosyncrasy' or 'hypersusceptibility' to the drug.

"Under those facts Judge Parker said: 'Applying these definitions to the facts of the case, it becomes readily apparent that the death of insured was caused by accidental means.' To paraphrase the language of Judge Sanborn, it was not the natural and probable consequence of the administration of the novocaine. Death does not ordinarily follow, and cannot reasonably be anticipated, from the use of the drug. Death was produced in the case of insured by means which were neither designed nor calculated to cause it. It was not the result of design, could not have been anticipated, and was produced by an unusual combination of fortuitous circumstances. In the act which preceded the death of insured there was 'something unforeseen, unexpected and unusual,' to use the language of Mr. Justice Blatchford, viz., the application of the novocaine to one who had an 'idiosyncrasy' or 'hypersusceptibility' to the drug. It is true that the doctor intended to apply the drug and insured intended that he should apply it; but neither intended to apply it to a body possessed of the idiosyncrasy. Death resulted because of their applying the drug in ignorance of this peculiarity in the object acted upon, and was a result not calculated nor intended, and one which could not reasonably have been foreseen.

. . . . . . . . . . . . . .

"The following federal decisions interpret the term 'accidental' in accordance with the principles discussed above: *Preferred Accident Ins. Co. v. Paterson,* (C. C. A. 3) 213 F. 595, 597 (policy limited coverage simply to 'accidental' means) ; *Aetna Life Ins. Co. v. Brand,* (C. C. A. 2) 265 Fed. 6, 8, 9, 13 A. L. R. 657, certiorari denied 253 U. S. 496, 40 S. Ct. 587, 64 L. Ed. 1031 ; *Zurich General Accident & Liability Ins. Co. v. Flickinger,* (C. C. A. 4) 33 F. 2d 853, 854, 855, 68 A. L. R. 161 (policy limited coverage merely to 'accidental' means) ; *Norris v. New York Life Ins. Co.,* (C. C. A. 4) 49 F. 2d 62, 63, 64 ; *New York Life Ins. Co. v. Gustafson,* (C. C. A. 3) 55 F. 2d 236, 237. See, also, Cooley's Briefs on Insurance, 2d ed., vol. 6, p. 5234."

In 5 Couch, Cyclopedia of Insurance Law, p. 4032, it is said:

"Notwithstanding the fact that if poison or an overdose of medicine is inadvertently or accidentally taken, the case involves some degree of negligence, it is generally held that resulting death or injury is from accident or accidental means. It has been held with respect to death resulting from an overdose of morphine taken unintentionally; an overdose of laudanum taken by mistake, and without suicidal intent; from drinking carbolic acid; from the accidental inhaling of too much chloroform by a physician in an effort to relieve himself of headache and insomnia; from the mistake of a physician in using poison for water; from unknowingly taking a poisonous drug given insured by mistake in place of a harmless drug which had been prescribed; . . ."

See, also, 6 Cooley, Briefs on Insurance, 2d ed., p. 5233.

As we have seen, payment was to be made in case death of the insured resulted solely from bodily injuries "caused directly, exclusively and independently of all other causes by external, violent and purely accidental means." In *McCullough v. Liberty Life Ins.*

*Co.,* 125 Kan. 324, 264 Pac. 65, payment was to be made if the injury was effected "directly and independently of any other cause, through external, violent and purely accidental means." In that case, where the language was almost identical with the language in the contract now before us, it was held that the killing of the insured by a third person, though intentional, was by "purely accidental means" within the meaning of the policy.

In *Gilliland v. Cement Co.,* 104 Kan. 771, 773, 180 Pac. 793, the word "accident" was defined thus:

"The word accident does not have a settled legal signification. It does have, however, a generally accepted meaning, which is the same whether considered according to the popular understanding or the approved usage of language. An accident is simply an undesigned, sudden, and unexpected event, usually of an afflictive or unfortunate character, and often accompanied by a manifestation of force." (See, also, 1 C. J. S. 448.)

We are therefore of the opinion that the death of the insured by reason of an overdose of barbital as shown by the record in this case was accidental within the meaning of the policy. We have examined the various specifications of error, but think it unnecessary to prolong this opinion by a more detailed examination of the errors assigned. Finding no material error in the record, the judgment of the trial court is affirmed.

WEDELL, J., dissenting.