## Beckham, Appellant, *v.* Travelers Insurance Company.

Argued April 22, 1966. Before BELL, C. J., MUSMAN-
NO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Charles Polis,* with him *Polis & Polis,* for appellant.

*Richard J. Van Roden,* with him *Pepper, Hamilton & Scheetz,* for appellee.

OPINION BY MR. JUSTICE ROBERTS, January 4, 1967:

Andrew Beckham, an employee of Humble Oil & Refining Company, named his mother, Elizabeth, beneficiary under a group life insurance policy issued by The Travelers Insurance Company on the life of Humble's employees. The policy provided for death benefits of $4,000 and also contained a double indemnity provision operative in the event that "bodily injury not hereinafter excepted effected directly and independently of all other causes through accidental means shall be sustained by a Participant while insured under this Part and shall result [in death]." Andrew died on March 21, 1963, as a result of a self-administered overdose of narcotics. Travelers paid Mrs. Beckham the $4,000 due as death benefits but denied liability under the double indemnity provision on the ground that Andrew's death, while admittedly not suicide, did not result from accidental means.

Mrs. Beckham instituted an action in the County Court of Philadelphia for the additional $4,000 where she received a favorable verdict; Travelers' motions for

judgment n.o.v. or a new trial were dismissed. On appeal to the Superior Court, the trial court was reversed and judgment ordered entered for Travelers. *Beckham v. Travelers Ins. Co.,* 206 Pa. Superior Ct. 488, 214 A. 2d 299 (1965) (WRIGHT, J., dissenting); see 70 Dick. L. Rev. 446 (1966). In so ruling, however, that court noted: "Were this a case of first impression in Pennsylvania, we might be inclined to follow the apparent trend of the recent decisions in other jurisdictions [and hold for the plaintiff] but we are bound by the decisions of our Supreme Court." Id. at 497, 214 A. 2d at 303. Thereafter we granted Mrs. Beckham's petition for allocatur.

The question posed on this appeal then is whether we shall continue to adhere to the distinction embodied in our case law with respect to insurance policies providing death benefits if the insured dies "through accidental means." We have in the past subscribed to the doctrine that recovery should be denied if the insured's death, although unintentional, resulted from an intentional act of the deceased, but that recovery should be permitted when the proximate cause of death was itself the result of an unforeseen or unexpected event. E.g., *Frame v. Prudential Ins. Co.,* 358 Pa. 103, 56 A. 2d 76 (1948); *O'Neill v. Metropolitan Life Ins. Co.,* 345 Pa. 232, 26 A. 2d 898 (1942); *Arnstein v. Metropolitan Life Ins. Co.,* 329 Pa. 158, 196 Atl. 491 (1938); *Hesse v. Traveler's Ins. Co.,* 299 Pa. 125, 149 Atl. 96 (1930); *Pollock v. United States Mut. Acc. Ass'n,* 102 Pa. 230 (1883); *Zuliskey v. Prudential Ins. Co.,* 159 Pa. Superior Ct. 363, 48 A. 2d 141 (1946); *Semancik v. Continental Cas. Co.,* 56 Pa. Superior Ct. 392 (1914).

The purported distinction between accidental means and accidental results stems from its articulation in *United States Mut. Acc. Ass. v. Barry,* 131 U.S. 100, 9 S. Ct. 755 (1889), where, in affirming the correctness of the trial judge's charge, the Supreme Court of the

United States stated: "The court properly instructed
. . . that the question was, whether there was anything
accidental, unforeseen, involuntary, unexpected, in the
act of jumping, from the time the deceased left the plat-
form until he alighted on the ground;. that the term
'accidental' was used in the policy in its ordinary, popu-
lar sense, as meaning 'happening by chance; unexpect-
edly taking place; not according to the usual course of
things; or not as expected;' that, if a result is such as
follows from ordinary means, voluntarily employed, in
a not unusual or unexpected way, it cannot be called a
result effected by accidental means; but that if, in the
act which precedes the injury, something unforeseen,
unexpected, unusual occurs which produces the injury,
then the injury has resulted through accidental means."
131 U.S. at 121. Almost half a century later, the
*Barry* distinction was reaffirmed in *Landress v. Phoe-
nix Mut. Life Ins. Co.,* 291 U.S. 491, 54 S. Ct. 461 (1934).

In a now famous dissent Mr. Justice CARDOZO, pre-
dicted: "The attempted distinction between accidental
results and accidental means will plunge this branch of
the law into a Serbonian Bog. 'Probably it is true to
say that in the strictest sense and dealing with the re-
gion of physical nature there is no such thing as an
accident.' On the other hand, the average man is con-
vinced that there is, and so certainly is the man who
takes out a policy of accident insurance. It is his read-
ing of the policy that is to be accepted as our guide,
with the help of the established rule that ambiguities
and uncertainties are to be resolved against the com-
pany. The proposed distinction will not survive the
application of that test." *Landress v. Phoenix Mut.
Life Ins. Co.,* 291 U.S. 491, 499, 54 S. Ct. 461, 463-64
(1934) (dissenting opinion). (Citations omitted.)

Indeed the tenuous distinction between accidental
means and results is well illustrated by the facts of
*Barry* and *Landress* themselves. In *Barry* the insured

jumped from a platform to the ground about five feet below, where the manner of his landing caused internal hemorrhaging from which he died several days later. The jury, finding that the insured had not intended to land in the precise manner in which he did, returned a verdict in favor of his beneficiary, which was affirmed by the appellate courts. In *Landress*, on the other hand, the insured's beneficiary was nonsuited because her complaint, which alleged that the insured died of sunstroke while playing golf, could not as a matter of law sustain a finding that death resulted through accidental means.

The New Jersey Supreme Court recently reaffirmed the *Barry-Landress* distinction. In so doing, it attempted to reconcile the multitude of opinions which have been written throughout the United States on this problem. *Linden Motor Freight Co., Inc. v. Travelers Ins. Co.*, 40 N.J. 511, 193 A. 2d 217 (1963). After a fairly exhaustive study, the Court concluded: "the decisions may be reconciled perhaps only on the basis that the actual rationale in each case is, in the final analysis, the particular court's conception of a fair and reasonable result on the specific facts, even though that thought may not be so candidly expressed in the language of the opinion, which ordinarily instead speaks of either the Barry or Landress dissent approach. And, there is, of course, plenty of room for difference of opinion with respect to the result in many cases or in a class of cases, as shown by differing conclusions among the states in analogous factual situations." 40 N.J. at 533. In our view this attempted reconciliation, especially since we are dealing with an insurance contract, is far from satisfactory.[1]

---

[1] The decedent in the New Jersey case died of a heart attack which was found to have been causally related to the act of picking up some fallen cartons in a warehouse. Since the average man does not usually consider a heart attack to be "an accident", the

In light of the New Jersey experience we do not believe that a detailed review of the cases in sister jurisdictions will materially aid us. For present purposes it is sufficient to note that the force of Mr. Justice CARDOZO's reasoning in *Landress* has spearheaded a trend away from the accidental means-result distinction. See Annot., 166 A.L.R. 469 (1947) ; 29A Am. Jur., Insurance, §1166 (1960). One authority even categorically states that a majority of jurisdictions no longer maintain the distinction.[2] 2 Richards, Insurance §216 (5th ed. 1952). However, as frequently happens when prior decisions are cast aside in favor of a more persuasive analysis, the accidental means-result dichotomy has not always been decently buried. See, e.g., *Cox v. Prudential Ins. Co.*, 172 C.A. 2d 629, 343 P. 2d 99 (1959) ; *Union Central Life Ins. Co. v. Cofer*, 103 Ga. App. 355, 119 S.E. 2d 281 (1961) ; *Haynes v. American Cas. Co.*, 228 Md. 394, 179 A. 2d 900 (1962) ; *New England Gas & Electric Ass'n v. Ocean Acc. & Guarantee Corp.*, 330 Mass. 640, 651-4, 116 N.E. 2d 671, 679-80 (1953) ; *Mills v. State Life & Health Ins. Co.*, 261 N.C. 546, 135 S.E. 2d 586 (1964). Instead it has been permitted to remain as a trap for the unwary.

Our own cases have also confirmed CARDOZO's prediction about plunging this branch of the law into a Serbonian bog. For example, utilizing the means-result distinction our Court has denied recovery where death

result, denying recovery under the double indemnity provision, may be correct under the CARDOZO view. Cf. *Miller v. Prudential Ins. Co.*, 183 Kan. 667, 331 P. 2d 310 (1958) ; *Schechter v. Equitable Life Assur. Soc'y*, 275 App. Div. 958, 89 N.Y.S. 2d 654 (1949) ; Annot., 56 A.L.R. 2d 800 (1957). We, of course, express no view on this precise point.

[2] Jurisdictions which have considered the question as one of first impression during the past decade have uniformly chosen the CARDOZO approach. *Gulf Life Ins. Co. v. Nash*, 97 So. 2d 4, 8 (Fla. 1957) ; *Scott v. New Empire Ins. Co.*, 75 N.M. 81, 400 P. 2d 953 (1965).

was caused by the insured's hypersusceptibility to a particular anesthetic, which had been properly administered to him during the course of an operation. Even in 1930 this was an extremely rare event, occurring only once in every hundred thousand administrations. *Hesse v. Traveler's Ins. Co.*, 299 Pa. 125, 128, 149 Atl. 96, 97 (1930). However, in *Urian v. Equitable Life Assur. Soc'y*, 310 Pa. 342, 165 Atl. 388 (1933), the insured was killed by carbon monoxide gas while working on his car in his garage. This Court permitted recovery on the theory that his inhalation of the gas was unconscious and unintentional.[3]

The insurance company admits that there was no evidence of suicidal intent in the instant case. Since the jury returned a verdict in favor of the plaintiff, our case law could support a conclusion that the Superior Court erred when it held as a matter of law that Andrew Beckham did not die by "accidental means." Thus in *Arnstein v. Metropolitan Life Ins. Co.*, 329 Pa. 158, 196 Atl. 491 (1938), the insured, under instructions to expose his foot to a heat lamp for five or six minutes,

---

[3] Compare, ALLOWING RECOVERY: *Arnstein v. Metropolitan Life Ins. Co.*, 329 Pa. 158, 196 Atl. 491 (1938) (overexposure to rays of heat lamp causing blister and fatal infection); *Eby v. Travelers Ins. Co.*, 258 Pa. 525, 102 Atl. 209 (1917) (choking to death on bristles of toothbrush); *McCarron v. John Hancock Mut. Life Ins. Co.*, 156 Pa. Superior Ct. 287, 40 A. 2d 118 (1944) (inhalation of formaldehyde vapors during course of employment); *Bloom v. Brotherhood Acc. Co.*, 85 Pa. Superior Ct. 398 (1925) (taking poison inadvertently); with DENYING RECOVERY: *Hesse v. Traveler's Ins. Co.*, 299 Pa. 125, 149 Atl. 96 (1930) (hypersusceptibility to anesthetic); *Pollock v. United States Mut. Acc. Ass.*, 102 Pa. 230 (1883) (taking poison inadvertently); *Zuliskey v. Prudential Ins. Co.*, 159 Pa. Superior Ct. 363, 48 A. 2d 141 (1946) (jumping out of moving automobile); *Kinavey v. Prudential Ins. Co.*, 149 Pa. Superior Ct. 568, 27 A. 2d 286 (1942) (falling off bridge while doing stunts in intoxicated state); *Trau v. Preferred Acc. Ins. Co.*, 98 Pa. Superior Ct. 89 (1930) (accidentally caused rupture necessitating operation from which insured died).

fell asleep on one occasion. As a result of this over-exposure, the rays of the lamp caused a blister which became infected and eventually caused his death. This Court permitted recovery on the theory that once the insured fell asleep the exposure of his foot to the rays was unintentional. In *Horan v. Prudential Ins. Co.*, 104 Pa. Superior Ct. 474, 159 Atl. 69 (1932), the insured started to run when a private watchman ordered him to stop. The watchman fired two shots in the air and a third one which caused the insured's death. The Superior Court affirmed a verdict for the plaintiff, holding that the question whether the insured intentionally exposed himself to a risk was a question of fact. See also *Neely v. Provident Life & Acc. Ins. Co.*, 322 Pa. 417, 185 Atl. 784 (1936); *Pomorskie v. Prudential Life Ins. Co.*, 318 Pa. 185, 177 Atl. 783 (1935); *Urian v. Equitable Life Assur. Soc'y*, 310 Pa. 342, 165 Atl. 388 (1933); cf. *McGarity v. New York Life Ins. Co.*, 359 Pa. 308, 59 A. 2d 47 (1948).

However, rather than continue upon our present course, we prefer to confront the issue directly and to expressly abandon the artificial distinction between accidental means and accidental results. Continued adherence to this distinction would not only fail to serve a useful purpose but would condone ambiguity in a context in which we have traditionally insisted upon clarity and precision. See *Papadell v. Harleysville Mut. Cas. Co.*, 411 Pa. 214, 191 A. 2d 274 (1963); *Weissman v. Prashker*, 405 Pa. 226, 175 A. 2d 63 (1961). As the court in *Mansbacher v. Prudential Ins. Co.*, 273 N.Y. 140, 143-4, 7 N.E. 2d 18, 20 (1937), a case in which the insured died of an overdose of barbiturates, succinctly stated: "[I]nsurance policies upon which the public rely for security in death, sickness or accident should be plainly written, in understandable English, free from fine distinctions which few can understand until pointed out by lawyers and judges. Ac-

cidental death means death by accident, and excludes suicide; death occurring through 'accidental means' in this case and under these circumstances is the same as death occurring 'by means of an accident.' "[4]

It has been suggested, however, that we limit our holding to those cases which do not involve an unreasonable risk of harm to the insured and that we therefore affirm the Superior Court's decision. This argument, of course, assumes that the insured's action in the instant case did amount to an unreasonable risk of harm. While this assumption might be valid vis-a-vis his general health and well being, there is no basis in the record for concluding that the insured was unduly exposing himself to the risk of death by his action.[5]

---

[4] An examination of the testimony of the medical expert in the instant case reveals that not only the average buyer of insurance but also the medical profession does not find the dichotomy previously accepted by us to be a fruitful one: "Q. Doctor, your conclusion that the death of Andrew Beckham was an accidental death was based on your findings and investigations that it was not the result of suicide, it was not the result of homicide, which means someone else killing him . . . .? A. Yes. Q. . . . isn't that right? A. Or a natural death. Q. Or a natural death, like dying from old age or something like that. Isn't that correct? . . . . A. . . . I think I would add to the list you gave me that there was present in the body a toxic material. This in and of itself would establish the cause of death. Now as to the manner of death, the ruling out of the other matters is the way the accidental death is considered to be arrived at. Q. Then the answer to my question is yes? A. Yes. Q. You are not saying, Doctor, that this fellow Andrew Beckham, injected himself accidentally with narcotics, are you? A. No. I'm not saying that he injected . . . Q. By accident? A. By accident."

[5] In *Aetna Life Ins. Co. v. Kent*, 73 F. 2d 685 (6th Cir. 1934), the insured killed himself with a gun during the course of a demonstration. The court found that the evidence would support either a finding that the insured had reason to suspect that the gun was loaded and thus committed suicide, or a finding that there was no suicidal intent. Although pointing guns at oneself obviously involves a considerable risk of harm, the court affirmed the jury verdict that the insured died through accidental means.

Moreover, no jurisdiction which has interpreted accidental means and accidental results to be legally synonymous has denied recovery on the basis of the above suggested distinction.[6] Indeed some jurisdictions maintaining the distinction have permitted recovery in similar situations.[7]

More importantly, the attempt to determine, on the basis of the clause in question, what is and what is not an unreasonable risk will return us to the Serbonian bog from which we are attempting to escape. While we see nothing improper in a contractual limitation which would disclaim coverage in cases such as the instant one, we are unwilling to recognize such a restriction on the basis of the ambiguous language contained in this policy which the company knew was susceptible of different interpretations.[8] Andrew Beckham's poli-

---

[6] See *Equitable Life Assur. Soc'y v. Hemenover*, 100 Col. 231, 67 P. 2d 80 (1937) (overdose of luminal) ; *Gulf Life Ins. Co. v. Nash*, 97 So. 2d 4, 8 (Fla. 1957) (pointing gun at self) ; *Spence v. Equitable Life Assur. Soc'y*, 146 Kan. 216, 69 P. 2d 713 (1937) (overdose of barbital) ; *Mansbacher v. Prudential Ins. Co.*, 273 N.Y. 140, 7 N.E. 2d 18 (1937) (overdose of veronal) ; *Carter v. Standard Acc. Ins. Co.*, 65 Utah 465, 238 Pac. 259 (1925) (overdose of laudanum) ; Annot., 52 A.L.R. 2d 1083 (1957).

[7] See *Pixley v. Ill. Commercial Men's Ass'n*, 195 Ill. App. 135 (1915) (overdose of morphine) ; *Brown v. Continental Cas. Co.*, 161 La. 229, 108 So. 464 (1926) (overdose of chloroform) (decided before Louisiana abandoned the accidental means-result distinction in *Schonberg v. New York Life Ins. Co.*, 235 La. 461, 104 So. 2d 171 (1958) ) ; *Travelers Ins. Co. v. Ansley*, 22 Tenn. App. 456, 124 S.W. 2d 37 (1938) (overdose of sedatives) ; *Hanna v. Rio Grande Nat'l Life Ins. Co.*, 181 S.W. 2d 908 (Tex. 1944) (overdose of sulfa.) ; cf. *New England Mut. Life Ins. Co. v. Hurst*, 174 Md. 596, 199 Atl. 822 (1938) (chronic alcoholism not within clause denying disability payments if disability results from self-inflicted injury).

[8] See *Rodgers v. Reserve Life Ins. Co.*, 8 Ill. App. 2d 542, 132 N.E. 2d 692 (1956) (death due to reckless driving accidental within policy which had no exposure-to-danger clause). Compare 2 Richards, Insurance §235 (5th ed. 1952).

cy provided for double indemnity in the event of an accidental death. "When a man has died in such a way that his death is spoken of as an accident, he has died because of an accident, and hence by accidental means." *Landress v. Phoenix Mut. Ins. Co.*, 291 U.S. 491, 499, 54 S. Ct. 461, 464 (1934) (dissenting opinion).

The order of the Superior Court is reversed and the record remanded with directions to enter judgment on the verdict.

---

CONCURRING OPINION BY MR. JUSTICE MUSMANNO:

The person who drives his automobile at 100 miles per hour on a congested highway is, in metaphorical language, "committing suicide," but if he is killed it does not legally or logically follow that he actually intended to take his life. Many, if not perhaps most, fatalities of a violent character (where crime is not involved), are due to poor reasoning, neglectful conduct, or a reckless attitude on the part of the deceased. An insomniac takes too many sleeping pills because he yearns to erase with a weary arm the slate of exhaustion, pain or sorrow; the swimmer dives into a shallow pool, seeking the exhilaration of cooling waters to drown the fatigue of a tired and weary body; a pedestrian runs across the street in front of a speeding streetcar because he sees on the other side of the thoroughfare a dear friend whose companionship will be medicine to his loneliness and despair. Where death results in such cases the result is accidental even though the deceased voluntarily rode the thunderbolt which killed him.

Andrew Beckham took an overdose of narcotics. Anyone who has read the classic *Confessions of an English Opium Eater* by Thomas DeQuincy will understand the beguiling heaven toward which Beckham was directing his steps as he followed the inviting primrose path into the soothing dreams of nepenthe.

The Travelers Insurance Company, in their brief, admit that "It is conceivable that Andrew Beckham intended to take the overdose for a stronger reaction, effect or 'kick' hoping it would not kill him." With that concession it was for the jury to decide whether Beckham's death was accidental or intentional.

The Insurance Company says that the plaintiff had the burden to prove that Beckham did not intend to kill himself. The jury was properly instructed as to the burden of proof and its verdict that Beckham did not voluntarily take passage over the river Styx is supported not only by the transcript of the trial, but also by the imperishable record of man's odyssey through life which irrefutably establishes that no one really wants to die.

Andrew Beckham wanted to live, if only to dive again into the shallow pool of artificial exhilaration, if only to cross the street to embrace the morphine sweetheart of heart's ease. He used bad judgment, he was reckless, he did not want to bring bereavement and sadness to his mother, and it is comforting to know that she will not be denied the money he provided to help her along the remainder of her lonely journey when he, even through his own negligence, involuntarily left her.

---

Dissenting Opinion by Mr. Chief Justice Bell:

I dissent.

Everyone agrees that this decedent died of an overdose of narcotics which he intentionally, not accidentally, took. Under the double indemnity provisions of this insurance policy, recovery was permitted only if bodily injury was effected *through accidental means.**

---

* "Bodily injury not hereinafter excepted effected directly and independently of all other causes *through accidental means* shall be sustained by a participant while insured under this part and shall result [in death]." (Emphasis added)

It is incomprehensible to me that a reasonable construction of that clause could provide an interpretation that "accidental" means or includes death *resulting from an intentional act of the deceased,* as the majority Opinion holds. The majority Opinion not only distorts the clear language of the contract but also overrules the long and well settled law of this Commonwealth that recovery should be denied unless the proximate cause of death was the result of an accidental event. *Frame v. Prudential Ins. Co.,* 358 Pa. 103, 56 A. 2d 76 (1948); *O'Neill v. Metropolitan Life Ins. Co.,* 345 Pa. 232, 26 A. 2d 898 (1942); *Arnstein v. Metropolitan Life Ins. Co.,* 329 Pa. 158, 196 Atl. 491 (1938); *Hesse v. Traveler's Ins. Co.,* 299 Pa. 125, 149 Atl. 96 (1930); *Pollock v. United States Mut. Accident Ass'n,* 102 Pa. 230 (1883); *Zuliskey v. Prudential Ins. Co.,* 159 Pa. Superior Ct. 363, 48 A. 2d 141 (1946); *Semancik v. Continental Casualty Co.,* 56 Pa. Superior Ct. 392 (1914).