## Forman v. State Farm Insurance Company

*William E. Averona*, for plaintiff.
*Frank A. Luchak*, for defendant.

KLEIN, R.B., *J.*, July 28, 1988 — Marc A. Forman suffered neck pain and a numbing of fingers following an auto accident. To rule out nerve damage, his orthopedic physician, Dr. John L. Sbarbaro Jr. had a thermogram performed. State Farm Insurance Company initially held up payment for the thermogram, stating that it was continuing its "investigation as to the accuracy and validity of thermograms." Later it denied payment based on current research that disputes the earlier claims of diagnostic accuracy for thermography. Forman brought suit under the Pennsylvania No-fault Motor Vehicle Insurance Act, 40 Pa. §1009.101 et seq.*

Three of the four physicians had been videotaped and a fourth had submitted a report. Both counsel agreed that the fourth doctor's report would be incorporated into the record as if he had testified. The parties then filed cross-motions for a directed verdict. The court granted the motion for directed verdict for plaintiff.

---

* Repealed. 1984 Pa.Legis.Serv., Act 11 §8.

There are four basic issues:

(1) Is thermography an accepted medical diagnostic procedure under the terms of the No-fault Act?

(2) Was thermography reasonably needed in the instant case?

(3) Was State Farm precluded from refusing to pay for thermography without first advising their insured that because of recent scientific studies, thermography was no longer considered a valid procedure?

(4) May plaintiff recover reasonable counsel fees?

### Is Thermography an Accepted Medical Diagnostic Procedure Under the Terms of the No-fault Act?

Thermography is a measurement of the temperature of the skin that is read by taking photographs of the area of the body, and differences in degrees of skin temperature are reflected in different colors on the photograph. In assessing nerve damage, two sides of the body, such as the two arms, are examined for differences from one side to the other. The theory is that if there is nerve damage, the amount of heat released from the injured area will be different and the pattern of skin temperatures will lose symmetry.

It is not disputed that thermography is widely used throughout the country. There are two different academies of physicians and others practicing thermography, which put out journals and newsletters. In fact, the defense expert is a founding member of the American Thermographic Society, now called the Academy or Society of Thermography.

Advocates of thermography include a professor of radiology on the staff of UCLA, Dr. Wexlar; and a

professor and chairman of the Department of Neurology of Georgetown University, Dr. Abernathy.

The experts called by the defense state that in their opinion, no one has ever performed a sufficiently controlled test to prove or disprove the effectiveness of thermography as a diagnostic tool for nerve injuries. Some studies have indicated that thermography is not effective. However, as admitted by the defense expert, other studies say it is very useful. Dr. Edeikin said that in a poll of orthopedic surgeons, only 5 percent used thermograhpy and 2 percent found it useful.

The documents cited by Dr. Edeikin are the bases of his judgment that thermography is a useless procedure. They are exhibits to his videotape deposition.

The Office of Health Care Technology of the National Center for Health Services Research and Health Care Technology Assessment issued in 1985, contains the following language:

"A review of the literature indicates that thermography has been accepted with considerable enthusiasm at many diagnostic and pain treatment centers . . . While the data gathered from these studies are encouraging, unfortunately, it does not withstand the rigorous scrutiny required for a technology whose efficacy is considered controversial in the broader medical community. . . .

"Themográphy for the diagnosis of nerve root lesions has been reported in the literature as a promising diagnostic adjunct to other standard diagnostic procedures. It is appealing to both physicians and patients because it is non-invasive and lacks the hazards of other diagnostic procedures. Unfortunately, evidence of the technology's clinical effectiveness has not been tested virogously in prospective controlled clinical trials. Thus, although

themography is a well-known technology, it does not appear to have achieved wide spread clinical acceptability as a clinically effective diagnostic procedure.

"NIH advised OHTA that further studies are required to validate the efficacy of thermography; that thermography may prove confirmatory as an adjunctive but not as an isolated diagnostic tool; and that there is a need for well-designed studies to validate its usefulness."

The American Medical Associations Technology Assessment project, called DATTA, contained the following language concerning thermography.

"Some authors have suggested the use of thermography as a screening technique for excluding patients who might otherwise be candidates for myelography or patients who may, in fact, be malingering. However, it must be conceded that false negative tests can be seen in patients with sacro-ilitis or lumbar disease. In addition a few panelists were concerned about the ease with which the application of the technique could be abused, even though it may have much potential for clinical utility.

"In summary, these newer thermographic imaging techniques are still under active investigation by several investigators who are attempting to determine the exact role of this imaging technique in screening for and diagnosis of certain low-back pain syndromes. Although they are safe, there is no convincing evidence yet that they provide a significant improvement in sensitivity or specificity over other more familiar diagnostic techniques. Thus, they must still be considered to be investigational and not yet established."

As Dr. Edeiken testified, Medicare and Medicaid accept thermography as a necessary tool, and it is also accepted in Canada and England.

Therefore, the literature and the expert testimony are in general agreement. At the present, the jury is still out on the effectiveness of thermography. It should not be used alone or instead of other methods of diagnosis. However, a significant minority of physicians believe that it can be an effective tool as an adjunct to X-rays, physical examinations and other techniques in helping with a diagnosis in the appropriate case.

The majority do not use thermography and some think it totally without merit. However, there is no definitive answer yet, and a significant number of physicians believe it helpful in the appropriate case. It is not to be used alone as a definitive diagnostic method. However, many feel it helpful with other tests in some situations.

The Pennsylvania courts have interpreted the provisions of the No-fault Act liberally, allowing coverage in disputed areas. As noted in *Heffner v. Allstate Insurance Co.*, 265 Pa. Super. 181, 401 A.2d 1160 (1979), aff'd, 491 Pa. 447, 421 A.2d 629 (1980): "Historically, the courts of this commonwealth have . . . found coverage for the insured in close or doubtful cases. The tendency has been that if we should err in ascertaining the intent of the legislative . . ., we should err in favor of coverage for the insured." *Id.* at 187, 401 A.2d at 1162-3: see also, *Cerrato v. Holy Redeemer Hospital,* 342 Pa. Super. 551, 493 A.2d 728 (1985); *Steppling v. Pennsylvania Manufacturers' Association Insurance Co.,* 328 Pa. Super. 419, 477 A.2d 515 (1984); *Crawford v. Allstate Ins. Co.,* 305 Pa. Super. 167, 451 A.2d 474 (1982); *Dull v. Employer's Mutual Casualty Co.,* 278 Pa. Super. 569, 420 A.2d 688 (1980). And in *Allstate Insurance Co. v. Williams*, 347 Pa. Super. 468, 500 A.2d 1151 (1985), the court

took note of this position in allowing chiropractic expenses as recoverable pursuant to the No-fault Act.

In another case affirming chiropractic services as making up part of the $750 threshold for suit, the Supreme Court said that there was "[a] legislative intent to assure that 'medical and dental services' includes not only direct but also supplemental support services." *Miller v. Johnson*, 496 Pa. 290, 436 A.2d 1187 (1981).

Therefore, since there is support for thermography by a reasonable minority of the medical profession, and the appellate courts affirm that the legislative intent is to broadly read what is considered a reasonable and necessary medical procedure under the No-fault Act, plaintiffs should be allowed reimbursement for themographs if justified by the facts of the individual case.

## Was Thermography Reasonably Needed in the Instant Case?

As discussed, thermograms should be used sparingly, and only when justified by the particular facts of the patient's situation. That is precisely the position taken by Dr. Sbarbaro, Dr. Forman's counsulting physician. Dr. Sbarbaro believed that the patient was recovering, and continued numbness in his arm was not due to a pinched nerve but from arthritic changes in the neck, aggravated by the accident. However, he wanted to further rule out the possibility of nerve damage. Rather than sending Dr. Forman to the hospital for more invasive tests such as a myelogram or CAT scan, or putting him in a much more restrictive collar, he recommended the thermograph, which could be done in the office. It was in fact negative, and therefore Dr. Sbarbaro did not use the more invasive and

more expensive tests, and stopped treating for the arm problem, and the symptoms went away.

There was some reason for concern. Several weeks after the accident, Dr. Forman complained of pains in his neck and right shoulder and a "pins and needles" feeling. Dr. Sbarbaro testified that he did the thermogram because it was less invasive, painful and detrimental to the health than other alternatives. Dr. Edeiken also testified as to the problems inherent in alternative tests.

Dr. Sbarbaro testified that thermogram assisted in his opinion that further treatment was not needed, and he did not therefore require what he called a "rather formidable immobilizing device on his neck."

The doctor testified that his charge for the thermogram was reasonable, and that it was less than other tools, such as a CAT Scan or an MRI. Although it was noted that the cost of a thermogram would be less if done with equipment set up for mass evaluations, for the lower number done in a doctor's office, the cost per thermogram was higher. The $400 figure is in line with that charged by other practitioners.

Therefore, if thermograms are to be used properly, it is for circumstances just as that in Dr. Forman's situation. It was not to replace the other tests as a definitive diagnostic technique. It was to confirm a judgment made by physical examination, regular X-rays, and general evaluation. If it had been positive, Dr. Sbarbaro would have ordered the more expensive tests that would have required at least a half a day of his patient's time, and would have put him in a significantly more restrictive collar. But since his initial judgment was confirmed, he did not need to resort to these measures. In fact, the costs to the carrier are *less* than they would have

been had Dr. Sbarbaro not ordered the thermogram in this case. He would have sent Dr. Forman for a *more* expensive test as an alternative, probably a CAT scan or an MRI. Further, both the more restrictive collar and the loss of time to do the test would have resulted in an increased wage loss for Dr. Forman. Therefore, not only is this an appropriate use of the thermograph, but this example lends credence to the position of those who say that there are circumstances when a thermogram is appropriate to supplement traditional diagnostic tools.

*Was State Farm Precluded From Refusing to Pay for Thermography Without First Advising Their Insured that Because of Recent Scientific Studies, Thermography was No Longer Considered a Valid Procedure?*

An insured has a contractual right with his carrier to be reimbursed for procedures he reasonably selects. Dr. Forman claims that he elected to be diagnosed by thermography at a time when it was the standard in the industry for no-fault carriers to pay for them. He contends that even if later research turns up evidence that the procedure does not have sufficient reliability to be considered "reasonable and necessary," he must be notified of this change before he undergoes the treatment so he can weigh that factor in making his choice.

The evidence is uncontradicted that thermography has been around for over 20 years and it is only recently that its value as a diagnostic tool has been substantially questioned. In fact, when Dr. Forman's bill was submitted to State Farm, the reply was that the company was continuing its "investigation as to the accuracy and validity of

thermography." It was only several months later that this investigation was concluded and the claim denied. Dr. Edeiken was the key defense expert who now says thermography is without merit. Even he was a founding member of the American Thermographic Society. It is also noted that one of the two reports upon which Dr. Edeiken relied was issued in 1985, *after* Dr. Forman's thermograph, and the other was only issued in 1983.

Thus, from the undisputed facts, it is seen that the trend has been away from the use of thermography. Until recently, it was considered a useful procedure. Therefore, it became the obligation of State Farm to advise its policy holders that because of recent research it would no longer pay for thermography. This is not an onerous task, as the company can include such an exclusion in its renewal notices.

The Pennsylvania courts have rejected the holding of *Hionis v. Northern Mutual Insurance Co.*, 230 Pa. Super. 511, 327 A.2d 363 (1974) that permitted a policyholder to avoid clear language in a policy. However, even in the case that reversed *Hionis, Standard Venetian Blind v. American Empire Insurance Co.*, 503 Pa. 300, 469 A.2d 563 (1983), the Supreme Court noted that contracts should be generally read in favor of the policyholder. In *Venetian Blind*, the insured attempted to recover for his own property damage despite clear language excluding such coverage in a liability policy. He claimed he never read the policy. Despite reversing *Hionis*, then Chief Justice Roberts quickly added:

"Although on this record we reject *Hionis*, we note that in light of the manifest inequality of bargaining power between an insurance company and a purchaser of insurance, a court may on occasion be justified in deviating from the plain language of a

contract of insurance. . . . [W]e hold only that where, as here, the policy limitation relied òn by the insurer to deny coverage is clearly worded and conspicuously displayed, the insured may not avoid the consequences of that limitation by proof that he failed to read the limitation or that he did not understand it." 503 Pa. at 307, 469 A.2d at 567.

In *Tonkovic v. State Farm Mutual Automobile Insurance Company*, 513 Pa. 445, 521 A.2d 920 (1987), the Supreme Court reversed a Superior Court holding and found that when a person bargained for disability insurance that would apply regardless of workers' compensation, the policyholder could recover even if the policy did not contain that provision when delivered. The court quoted the above language from *Venetian Blind* and interpreted it by saying:

"Thus, we made it clear that our holding [in *Hionis*] was not to be mechanically applied without regard to the factual context in which the claim arose." 513 Pa. at 453-4, 521 A.2d at 924-5.

The court affirmed the strong language of *Collister v. Nationwide Life Insurance Co.*, 479 Pa. 579, 388 A.2d 1346, cert. denied, 439 U.S. 1089, 99 S. Ct. 871, 59 L.Ed. 2d 55 (1978):

"The reasonable expectation of the insured is the focal point of the insurance transaction involved here. E.g., *Beckham v. Travelers Insurance Co.*, 424 Pa. 107, 117-8, 225 A.2d 532, 537 (1967). Courts should be concerned with assuring that the insurance purchasing public's reasonable expectations are fulfilled." *Collister, supra.*

The Supreme Court has also held that when there is "specialized language," purchasers can rely on the agent's "translation" of the meaning of the offer. *Rempel v. Nationwide Life Insurance Co.*, 471 Pa.

404, 370 A.2d 366 (1977). The Rempels wanted Nationwide to match another insurance company's policy that would pay off their mortgage and pay an additional $5,000 and, despite the assurances of the agent, the technical language of the policy did not provide that coverage.

In *Brakeman v. Potomac Insurance Co.*, 472 Pa. 66, 371 A.2d 193 (1977), the court found that an insurance clause providing for notice of an accident "as soon as practicable" should be read to mean that the insurance company can refuse compensation to the insured only when there is prejudice to the insurance company. Then Chief Justice Eagen quoted the language of the Supreme Court of New Jersey, which in *Cooper. v. Government Employees Insurance Co.*, 51 N.J. 86, 237 A.2d 870 (1968) stated:

"[W]e have recognized that the terms of an insurance policy are not talked out or bargained for as in the case of contracts generally, that the insured is chargeable with its terms because of a business utility rather than because he read or understood them, and hence an insurance contract should be read to accord with the reasonable expectation of the purchaser so far as its language will permit." *Cooper, supra.*

Because the medical community had generally accepted thermography for a number of years, thermograms are accepted in other countries, Medicare pays for them, other carriers pay for them, and, in fact, on other occasions State Farm has paid for them, Dr. Forman and Dr. Sbarbaro had a reasonable expectation that they were to be considered "reasonable and necessary" expenses. Even if a thorough review of recent studies proved State Farm correct that the early promise of thermography had proven false, this change in posi-

tion could not have been anticipated by the insured. Therefore, absent a notice of a change in position from the general standard, Dr. Forman had a reasonable expectation that he would be reimbursed for this procedure. If the generally accepted terms "reasonable and necessary" are now to be held to exclude thermography, this change should be made by a specific notice of exclusion to the insured.

## *May the Plaintiff Recover . Reasonable Counsel Fees?*

Plaintiff is entitled to reasonable counsel fees if no-fault benefits have been denied "without reasonable foundation." 40 P.S. §1009.107(3) (Supp. 1983). In the instant situation, although plaintiff's claim is for only $400, State Farm was viewing this action as a test case. The company deposed two expert physicians and was prepared to call a third live. Dr. Edeiken was flown to Philadelphia from Houston for his videotape deposition. Obviously, the matter in controversy was worth more than $400 to State Farm. Plaintiff was therefore put in the position of being forced to turn his complaint into a class action or to spend considerable time and money to counter the major attention given this relatively minor individual claim by State Farm.

The instant situation is different from the case where benefits are denied because a plaintiff does not supply sufficient documentation of his injury to justify payment, and the full story only comes out at trial. That is the typical situation where although benefits are due, there was good reason not to pay initially.

A legal reason for refusing payment should be treated somewhat differently from a factual issue.

The Supreme Court allowed reasonable counsel fees in *Motley v. State Farm Mutual Insurance Co.,* 502 Pa. 335, 466 A.2d 609 (1983). The issue was whether no-fault benefits had to be paid to make up the difference between lost wages and Workmen's Compensation benefits. Justice Larsen pointed out that another Supreme Court case had been handed down on this issue, but as pointed out by Chief Justice Roberts in dissent, the earlier case was only a plurality opinion.

The Superior Court has also been liberal in allowing counsel fees when benefits are awarded and the reasons for failure to pay are legal rather than factual. In *Steppling v. Pennsylvania Manufacturers' Association Insurance Co., supra,* in what the court notes was an issue of first impression, no-fault benefits were held to be payable even if Blue Cross paid the same medical bills. The court also allowed counsel fees. Judge Johnson noted that absence of judicial precedent does not invariably provide an insurance carrier with "reasonable foundation" for denying a claim, although it is a factor entitled to substantial weight. He also noted that other insurance carriers routinely honored the kind of claims denied by PMA.

Even in denying counsel fees, the appellate courts have given wide discretion to trial courts in making determination of "reasonableness." In *Hayes v. Erie Insurance Exchange,* 261 Pa. Super. 171, 395 A.2d 1370 (1978), the court allowed payment to a woman who was hit as a pedestrian under the driver's No-fault policy. The woman, who was emerging from her parked car when hit, had failed to get insurance for her own car. Under these circumstances, plaintiff's counsel fees were denied by the trial judge, and his decision was supported by the Superior Court. In *Hayes,* however, there was

no claim that other carriers in the past had made payments under similar circumstances. Likewise, the court noted that the Ms. Hayes herself failed to comply with the No-fault Act. There, the equities were with the carrier.

Likewise, in *Rago v. State Farm Mutual Automobile Insurance Co.*, 355 Pa. Super. 207, 513 A.2d 391 (1986), Judge Beck noted that an insurer has no reasonable basis to refuse payments if a Superior Court case went against them. However, the situation is reversed if the Supreme Court agrees to hear the case, since that shows the Supreme Court thinks there is a reasonable controversy on the issue. However, in the instant circumstance, there was *no* precedent either way in the appellate courts, and the reasonableness of the refusal to pay must be an equitable decision based on all of the facts.

In the instant case, the equities are with Dr. Forman. This court has found that the situation with chiropractors demonstrated that no-fault benefits are to be construed broadly. Moreover, the past reliance on thermography as well as payment by others for thermograms further provides a contract basis which precludes refusal of payments by the carrier without prior notification of the exclusion. Particularly when the carrier places plaintiff's counsel in the position of having to expend significant time on a $400 case because the defendant views it as the "test" case, the court is reluctant to place the financial burden of counsel fees on plaintiff or on plaintiff's counsel. Carriers should not be able to defeat the rights of the insureds by making it prohibitively expensive for them to stand up for their legal rights. Under all the circumstances of this case, the court holds that there was no "reasonable basis," to refuse payment of the claim.